STATE of Missouri, Respondent,

v.

Gerald Duane GARRETT, Appellant.

No. 62482.

Supreme Court of Missouri,
En Banc.

Feb. 9, 1982.
Rehearing Denied March 9, 1982.

Toby H. Hollander, St. Louis, for appellant.

John Ashcroft, Atty. Gen., Rosalynn Van Heest, Asst. Atty. Gen., Jefferson City, for respondent.

MORGAN, Judge.

Appellant, being charged by indictment with capital murder in connection with the death of one Agnes Grote, was tried to a jury and convicted of first degree murder and sentenced to life imprisonment.

She was killed on the morning of April 3, 1977. At approximately ten o'clock on that date, a neighbor noticed smoke coming from Mrs. Grote's house. The fire department was called and the fire, which was not too extensive, was extinguished. Her body was discovered underneath a smoldering mattress. An autopsy revealed that death was caused by several violent blows to the head and at least three stab wounds in the neck. A wooden 2 × 2 inch board, which had been used to brace the house door, was identified as the probable weapon. It was found broken in two near the victim and a fragment from the board was removed from her throat during the autopsy. Although her body had been burned to some extent, the medical examiner determined that death had occurred some hours before the burning. An inspector concluded that the fire had been set deliberately because it had six origins.

The officers observed that a storm door had been removed from its hinges and was hanging from a hydraulic closer; that screwdriver "pry" marks were evident thereon; that glass had been broken from the storm door and a pane of glass, above a dead bolt lock, had been broken on the inner door; that a bootprint made by an "army-style" boot was in the yard near the entrance and a cast was made of it; and that glass fragments and the broken board had been collected.

Appellant lived four houses from Mrs. Grote and at the time of her murder was free on bond pending appeal of his conviction for the murder of one Estelle Stern, who had lived several blocks away. Thereafter, the latter conviction was vacated by the Court of Appeals and appellant was acquitted on retrial.

Two days after the death of Mrs. Grote, appellant was arrested without a warrant at his place of employment and glass fragments were removed from the soles of his boots. As the 20-hour "hold" rule approached, a hearing was held wherein the prosecutor's request for an increase of the existing appeal bond in the Stern case was sustained. On the next day, a search warrant issued and four screwdrivers were seized at appellant's home.

We consider appellant's points in the order presented.

■ First, it is argued that: "The indictment in this case failed to charge capital murder because it failed to allege an essential element of the offense, i.e., malice aforethought. This defect deprived the lower court of jurisdiction and rendered defendant's conviction a nullity." As a historical basis for the argument as made, appellant submits that: "Gradually, the common-law courts began to distinguish manslaughter from murder. 'Malice aforethought was designated as the element that distinguished the two crimes . . . .' Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). See generally Perkins on Criminal Law 38 (1969); Lafave & Scott, Criminal Law 528 (1972)."

■ Respondent does not deny that malice aforethought is an element of capital murder, but does deny that it must be alleged specifically in an indictment or information. We agree. To make the charge, it is necessary to allege that the accused acted "unlawfully, willfully, knowingly, deliberately, and with premeditation"[1] which would encompass any definitional concept of malice aforethought. As said in State v. Strickland, 609 S.W.2d 392 (Mo.banc 1981) at 395:

> The test of the sufficiency of an indictment is whether it contains all the essential elements of the offense as set out in the statute and clearly apprises defendant of the facts constituting the offense in order to enable him to meet the charge and to bar further prosecution. State v. Tandy, 401 S.W.2d 409, 412–13 (Mo.1966); State v. Bott, 518 S.W.2d 726, 728 (Mo. App.1974).

Comparable results may be found in State v. Hammond, 571 S.W.2d 114, 116 (Mo. banc 1978) and State v. Downs, 593 S.W.2d 535, 540 (Mo.1980), and the point is ruled against appellant.

Second, appellant challenges the grand jury which returned the indictment against him, both as to (1) the procedure by which its members were selected and (2) the method whereby the foreman (foreperson) thereof was designated. Initially, we note our recent holding in State ex rel. Garrett v. Saitz, 594 S.W.2d 606 (Mo.banc 1980), wherein appellant was the relator and moving party, at page 608 that:

> The United States Supreme Court has held that a criminal defendant in a state court has a constitutional right to have the grand jury considering his case selected from a fair cross-section of the community. Carter v. Jury Commission, 396 U.S. 320, 332, 90 S.Ct. 518, 524, 24 L.Ed.2d 549 (1970); Brown v. Allen, 344 U.S. 443, 474, 73 S.Ct. 397, 416, 97 L.Ed. 469 (1953).

The legislature by statute has directed that in St. Louis County: "The circuit

1. Section 565.001, RSMo 1978.

judges, or in lieu of a circuit judge the presiding judge may assign an associate circuit judge to act for a circuit judge, shall constitute a board of jury supervisors for the county, a majority of whom shall constitute a quorum for the transaction of business...." § 496.020, RSMo 1978. "The board of jury supervisors shall select the names of six hundred persons, known or believed by them to be in every way fitted for grand jury service, the selection to be repeated whenever deemed necessary by the supervisors, and the names shall be by them deposited in a special grand jury wheel, which, after being properly secured, shall be delivered to the clerk of the board of jury supervisors, who shall be responsible for the proper custody of the same, and which after the names are once placed therein, shall be opened and drawn only by a member of the board of jury supervisors in the presence of the other members of the board or a majority of them, upon the requisition of the judge having charge of the grand jurors for such number of grand jurors as may be required at any one time." § 496.160(1), RSMo 1978. All names placed on the master list by the "board" shall be persons "sober and intelligent, of good reputation, over twenty-one years of age and otherwise qualified." § 494.010, RSMo 1978.

■ The practice in St. Louis County is to draw one hundred names, at random, from the grand jury wheel. Sec. 496.170, RSMo 1978, requires that a minimum of twenty-four names be drawn. From the list thus created, the judge in charge of the particular grand jury may use any method, including personal interviews, to select the twelve persons to serve. This discretion plus use of the so-called "key man" system in the initial selection of the grand jury pool admittedly provides at least an opportunity for discrimination. However, neither the "key man" procedure nor the "opportunity" to discriminate rises to a *per se* constitutional violation. *Hernandez v. Tex-*

*as,* 347 U.S. 475, 478–79, 74 S.Ct. 667, 670–71, 98 L.Ed. 866 (1953); *Cassell v. Texas,* 339 U.S. 282, 284, 70 S.Ct. 629, 630, 94 L.Ed. 839 (1949); *Carter v. Jury Commission of Greene County,* 396 U.S. 320, 331–37, 90 S.Ct. 518, 524–28, 24 L.Ed.2d 549 (1969). *Compare Turner v. Touche,* 396 U.S. 346, 355, 90 S.Ct. 532, 537, 94 L.Ed. 839 (1969) (companion case to *Carter, supra*) and *State v. Ramsey,* 355 Mo. 720, 197 S.W.2d 949, 952 (banc 1946). Nevertheless, "key man" systems have been found unconstitutional in application. *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).

■ It is alleged that the procedure followed violated appellant's fifth and sixth amendment rights (U.S. Constitution). "In order to show that an equal protection [fifth amendment] violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs." *Castaneda, supra,* at 494, 97 S.Ct. at 1280.[2] "The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. (Citations omitted). Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. (Citations omitted). Finally, as noted above, a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing." 430 U.S. at 494, 97 S.Ct. at 1280. To prove a fair cross-section (sixth amendment) violation has occurred, the defendant must show that (1) the group excluded is a "distinctive" group within the community; (2) the representation of this group is not fair and reasonable in relation to the number of such persons in the community; and (3) the un-

---

**2.** Decisions have held one need not belong to the specific race or group to have standing to challenge the alleged violation. *Peters v. Kiff,*

407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972); *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

derrepresentation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

■ We have before us evidence only as to the composition of a single grand jury pool, and it tends to be inadequate for examination of the degree of under-representation in relation to the community. *State v. Dowe,* 432 S.W.2d 272 (Mo.1968); *United States v. Williams,* 421 F.2d 529 (8th Cir. 1970). As noted by Spenlich and Jaspovice, *Grand Juries, Grand Jurors, and the Constitution,* 1 Hast.Con.L.Q. 63 (1974): "Representativeness does *not* mean that all grand juries must include members of each and every identifiable community group. Nor does the representativeness requirement demand exact proportional representation for the various community groups. *Similar in effect to these pronouncements is the [Supreme] [C]ourt's position that the composition of a single grand jury may not provide adequate grounds for a test of representativeness, but that a sequence of jury panels or venires may have to be considered." Id.* 88 (Citations omitted) (Emphasis added). A review of cases on the subject compels the same conclusion. For instance: in *Norris v. Alabama,* 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935), testimony was that no black had served on a grand or petit jury in the county within the memories of witnesses 50–75 years of age, and the Court condemned the "long-continued, unvarying and wholesale exclusion of negroes from jury service"; in *Cassell v. Texas,* 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950), the Court examined a 5-year span encompassing 21 grand juries; in *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), the evidence was that no one with a Mexican or Latin surname had served on any jury for 25 years; in *Eubanks v. Louisiana,* 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958), the relevant time period was eighteen years; in *Smith v. Texas,* 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940), the Court observed the systematic exclusion of blacks during a 7-year span; and in *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), the

time frame was eleven years. *See State v. Davidson,* 583 S.W.2d 208 (Mo.App.1979) for a similar review and discussion; and *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), wherein the court said, at 538, that ". . . we impose no requirement that petit juries actually chosen must mirror the community" and "Defendants are not entitled to a jury of any particular composition."

Logic alone dictates that an alleged *systematic* exclusion cannot be shown by a *single* instance. Even though we were for purposes of discussion to assume the opposite, we are not convinced that the evidence presented would show a prima facie case of illegal selection.

Similar evidence was presented by the appellant in *State v. Davidson, supra,* and the court reached the same conclusion in an opinion authored by Higgins, J. (sitting by special assignment). In that case, the grand jury wheel was composed of 70% male, 25% female, and 5% unknown (because of failure by jurors to respond to questionnaires) with 14% black. The instant case evidences a grand jury wheel with 63.4% male, 36.6% female and 6.52% black. The latter figures represent a higher percentage of females than in *Davidson* ; and while the percentage of blacks in the instant case is less, the relevant census data suggests that blacks make up only 7.55% of the relevant community. It is the percentage of the group in the *population* that is to serve as the basis for comparison with the grand jury wheel. *Castaneda, supra.* The disparity is only 1.03% and cannot reasonably be said to demonstrate a deliberate exclusion of blacks, and this sub-point is ruled against appellant.

■ Next, within the same point, we consider the alleged discrimination in selecting a grand jury member to act as foreman. Evidence indicated that during the last sixteen years, with 48 grand juries, one black and three women had served as had forty-four white males. In *Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), the Supreme Court dealt squarely

with the issue and said that: "[I]n order to show an equal protection violation has occurred in the context of grand jury [foreman] selection, the defendant must show that the procedure employed resulted in substantial under-representation of his race or of the identifiable group to which he belongs." *Id.* 565, 99 S.Ct. at 3005 (citing *Castaneda v. Partida, supra* ). Assuming that each person serving during the period was qualified to act, a prima facie case perhaps would be evident. However, from the evidence offered such an assumption would be unjustified.

Three of the circuit court judges, who were jury commissioners, testified on this specific issue. Judge Ruddy testified that he always had women and blacks on every grand jury he had held; that he made an effort to keep up with the population trends to be representative on the wheel; that in picking a foreman, one looks for a reliable and conscientious individual with leadership qualities, and that he would not be reluctant to appoint any qualified person. Judge Hoester testified that in selecting a grand jury foreman he looked for "leadership aspects" and previous grand jury experience, and that race and sex had not been taken into account in selecting foremen. Judge Corrigan testified [3] that he chose a foreman on the basis of organizational and leadership qualities, and that he would not be reluctant in any way to select a black or a woman, otherwise qualified, as foreman. In *United States v. Holman*, 510 F.Supp. 1175, 1180 (N.D.Fla.1981), the Court summed up its response to similar testimony by holding that: "This court finds that the government's interest in selecting the best qualified person to the office of grand jury foreperson is manifestly advanced by the criteria employed . . . in selecting grand jury forepersons."

■ Rebuttal evidence may include testimony from government officials concerning the methods of and qualifications for selection, *Castaneda, supra*, 430 U.S. at 498, 97 S.Ct. at 1282, but it should be viewed with "a great deal of judicial scrutiny" in recognition of a defendant's difficulty in contesting the protestations of government officials. Having considered the denial of any prejudice or discriminatory intent in selecting forepersons by the participating judges, under the "heightened" scrutiny required, we cannot rule that the alleged deprivation exists and the point is ruled against appellant.

■ Third, it is argued that the trial court erred in denying appellant's motion for either (1) the names and addresses of persons in the grand jury pool, or (2) data regarding age, occupation and socio-economic status of those in the pool, as the withholding of said data denied appellant an opportunity to prove an absence of a fair representation of the community.

This issue was before us in *State ex rel. Garrett v. Saitz*, 594 S.W.2d 606 (Mo.banc 1980) in which the court limited the information which appellant could receive concerning the composition of the grand jury pool to race and gender. We found no compelling reason to order the release of the additional data and no new arguments have been presented in the instant case, and thus, we rule the point against appellant.

Fourth, appellant contends the trial court erred in denying his motion to suppress

---

**3.** Representative answers by him are:

"Q. But when you choose a foreman, are there any particular qualifications amongst the group that you looked for to be a foreman?
A. In the Grand Juries that I have had when I ultimately determined, let's say, who the twelve (12) are potentially going to be, each one I interviewed I asked that person if he or she would, if asked to be foreman, would he or she serve as such. *Most of the time the large majority of them would disqualify themselves from being foreman because they didn't want the responsibility. . . .* Usually it was a rela-

tively easy choice, *because most people disqualify themselves from that responsibility. . . .* I think that in most instances in my experience, one of several people on the Grand Jury could serve as foremen. *As I said, some disqualify themselves.*

\*   \*   \*   \*   \*   \*

Q. On an average, how many people do you have to choose from who say they are willing to be foremen?
A. . . . *I wind up dealing with less than a half dozen who are willing to serve as foreman, and it's more like four.*" (Emphasis added.)

articles obtained through an alleged unreasonable search and seizure because: (1) the warrantless arrest was without probable cause to arrest, (2) the search warrant for appellant's home was issued without probable cause, and (3) the search warrant for appellant's home was fatally tainted by the evidence seized incident to appellant's arrest, which lacked probable cause, thereby denying appellant his right to be secure from unreasonable searches and seizure.

■ It should be noted, initially, that the lawfulness of an arrest without warrant must be based upon probable cause. This proposition is so well recognized that it needs no authority. "Probable cause" is said to exist where the facts and circumstances within the officer's knowledge and of which he has reliable and trustworthy information would warrant a man of reasonable caution to believe that the person being arrested had committed the offense for which he has been placed in custody. *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949); *Ker v. California*, 374 U.S. 23, 34–35, 83 S.Ct. 1623, 1630–31, 10 L.Ed.2d 726 (1963). In *State v. Wiley*, 522 S.W.2d 281, 287 (Mo. banc 1975), a good collection of the general rules regarding the analysis of a probable cause problem may be found.

■ Our inquiry must be based upon the "particular facts and circumstances of the individual case," remembering the "broad gulf" between that quantum of proof necessary to prove guilt and that necessary to equal probable cause. An examination of the facts in this light leads to the conclusion that probable cause did exist. Appellant, at the time of the homicide, had been convicted of the murder of another elderly lady, a Mrs. Stern, for whom appellant had been employed to mow her lawn. There was a substantial, if not an overwhelming, similarity between the deaths of Mrs. Stern and Mrs. Grote. Both were elderly ladies who lived alone. Both knew appellant: Mrs. Stern knew him personally through the aforementioned employment, while there was evidence that Mrs. Grote also knew of him. The appellant had been

a suspect in at least one of two burglaries of the Grote household reported by her a few years earlier. In the burglary in which appellant was a suspect, the same entry had been made as was made for the present homicide by breaking the same pane of glass on a side door of Mrs. Grote's house. In both the Stern and Grote homicides, both houses had been entered by a side door. Both killings were effected by weapons found by the murderer inside the residences. Both involved stabbings. Both occurred during daylight hours. The same closet, ransacked during the earlier burglary, was ransacked at the time of Mrs. Grote's death. Both homicide victims resided in the same general vicinity. Further evidence available and known to the police demonstrates that appellant was seen outside his house only 2 to 3 hours before the homicide and again soon afterward. A fresh footprint, apparently made by a heavy boot, was found outside the Grote residence after the murder was discovered; and, when the police approached appellant in connection with the crime, he was observed wearing military-type boots, with a tread design similar to that of the bootprint. A muddy bootprint had also been found on Mrs. Grote's rug during investigations in connection with the previous burglary. The door which provided entry into the Grote residence had scrape marks identified as being made by a small screwdriver, and appellant had recently purchased a tool set that contained such a screwdriver. An anonymous caller had notified the prosecutor that she was a good friend of appellant's, and that he had murdered Mrs. Grote. This evidence, taken together, forms a sufficient basis upon which the police could determine that there existed probable cause to arrest, and the three subpoints necessarily fail.

Fifth, the trial court is charged with prejudicial error in (1) sustaining the state's objections to certain voir dire questions regarding circumstantial evidence, (2) overruling a motion to strike a prospective juror for cause, and (3) in overruling his motion for mistrial because the state struck blacks from the panel.

The defense asked individual jurors three questions[4] about their ability to follow the instructions pertaining to circumstantial evidence. An objection to each was sustained, and it is argued that it was a proper subject for inquiry. We agree. However, the actual issue appears to be the manner in which the law was characterized and the style of the questions. Necessarily, we recognize the broad discretion vested in the trial court for determining the propriety of questions during voir dire. Absent an abuse thereof, we should not interfere. *Smith v. Nickels*, 390 S.W.2d 578 (Mo.App. 1965); *State v. Mudgett*, 531 S.W.2d 275 (Mo. banc 1975); *State v. Scott*, 515 S.W.2d 524 (Mo.1974). As said in the *Smith* case, questions seeking to reveal a present state of mind create no difficulty. However, "when the inquiry includes questions phrased or framed in such manner that they require the one answering to speculate on his own reaction to such an extent that he tends to feel obligated to react in that manner, prejudice can be created. The limitation is not as to the information sought but in the manner of asking." *Id.* at 582. A similar problem and consistent result may be found in *Brown v. Bryan*, 419 S.W.2d 62 (Mo.1967). An area is involved which cannot be standardized and we believe the matter fell within the recognized discretion of the trial court.

The complaint as to the failure to dismiss one prospective juror for cause stemmed from defense counsel's question as to whether or not he could give appellant the "presumption of innocence." After the usual ambivalent answers, the court asked as to his ability to listen to the evidence and instructions, set aside any pre-conceived notions, and render a fair and impartial verdict. With the response being that he "could," we cannot declare error by the trial court. Qualifications of a prospective juror

are not determined conclusively by his or her initial response to a question but are made upon the basis of the entire examination. *State v. Treadway*, 558 S.W.2d 646 (Mo. banc 1977), *cert. den.* 439 U.S. 838, 99 S.Ct. 124, 58 L.Ed.2d 135.

The alleged error of the state in using peremptory challenges to strike black members from the panel must be rejected. This state follows the law set out in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) in which it was held that a defendant must allege such exclusion was made ". . . in case after case, whatever the circumstances . . . ." *Id.* at 223. *United States v. Pollard*, 483 F.2d 929 (8th Cir. 1973), *cert. den.* 414 U.S. 1137, 94 S.Ct. 882, 38 L.Ed.2d 762; *State v. Baker*, 524 S.W.2d 122 (Mo. banc 1975).

Sixth, complaint was made against the admission of testimony of the pathologist based on rigor mortis. Expert testimony and its acceptance as evidence falls "within the sound discretion of the trial court," *Eickmann v. St. Louis Public Service Co.*, 363 Mo. 651, 253 S.W.2d 122, 130 (1952), and we find no error.

Seventh, objections made to the closing argument of the state were generally sustained or if denied were not preserved. Several times the trial court gave more relief than that requested, and a detailed recitation thereof would gain nothing.

Lastly, it is asserted that a submissible case was not made. In resolution thereof, we are to view as true the evidence tending to prove defendant's guilt, whether or not such evidence is circumstantial in nature, along with reasonable inferences therefrom, and disregard evidence and inferences to the contrary. *State v. Morgan*, 612 S.W.2d 1 (Mo. banc 1981), *State v. Johnson*, 457 S.W.2d 795 (Mo.1970). We must conclude that there was substantial evi-

---

**4.** (1) "This is a circumstantial evidence case, and as such a case the judge will instruct you you can only find the defendant guilty if the evidence from the case leads only to guilt, and you would have to exclude every reasonable theory of innocence. Do you think you can follow that instruction?" (2) "If after hearing the evidence you felt from the facts you heard there was a reasonable hypothesis about Gerald's innocence, would you have any problem returning a not-guilty verdict?" (3) "If from the facts you felt that there was a reasonable hypothesis of his innocence, would you be able to return a not-guilty vote?"

dence to support the jury verdict of first degree murder.

Finding no reversible error, the judgment should be and is hereby affirmed.

All concur.