STATE of Missouri, Respondent,

v.

Andrew LYONS, Appellant.

No. 79129.

Supreme Court of Missouri,
En Banc.

Aug. 19, 1997.

Rehearing Denied Sept. 30, 1997.

D. Terrell Dempsey, Hannibal, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Stacy L. Anderson, Asst. Atty. Gen., Jefferson City, for Respondent.

WHITE, Judge.

A jury convicted defendant Andrew Lyons of two counts of murder in the first degree and one count of involuntary manslaughter. Lyons was sentenced to death by lethal injection for the murder of his girlfriend, Bridgette Harris. He was also sentenced to death for the murder of Bridgette's mother, Evelyn Sparks. Lyons was sentenced to seven years in prison for causing the death of his son, Dontay Harris. This Court has exclusive jurisdiction over the appeal. *Mo. Const. art. V, § 3.* We affirm the judgments.

## I. FACTS

This Court reviews the facts in the light most favorable to the verdict. *State v. Shurn,* 866 S.W.2d 447, 455 (Mo.banc 1993).

As of September 1992, Andrew Lyons and Bridgette Harris had been living together for three years in Cape Girardeau, Missouri. Their eleven-month old son, Dontay, lived with them, as did Bridgette's two children from a previous relationship, seven-year-old Demetrius and four-year-old Deonandrea. Approximately one week before the murders, Lyons told a longtime friend that he was having problems with Bridgette. Lyons told the friend that "he just felt like killing" and that the "best thing for [Bridgette] to do ... was to get killed...." Around the same time, Bridgette moved out of the house she shared with Lyons. She and the three children moved in with Bridgette's mother, Evelyn Sparks.

Two days before the murders, Lyons drove his truck alongside Bridgette and her older sister while they were walking on a sidewalk. He stopped the truck and pulled forward the passenger's seat, revealing a shotgun. The women ran away and reported the incident to the police.

The day before the murders, Lyons told another friend that Evelyn was interfering with his relationship with Bridgette and that "she should leave them alone or he would kill her." That night, he told Bridgette's best friend that "I am going to end up killing [Evelyn]." Around midnight, Lyons told yet another friend that he was going to shoot Evelyn with his shotgun and "catch a train out of here."

On the morning of Sunday, September 20, 1992, Lyons went to Evelyn's house, where Bridgette was staying. He and Bridgette argued. Lyons left, went back to his house, and grabbed his shotgun and a duffel bag packed with clothes and ammunition. Shortly after 10 a.m., Lyons returned to Evelyn's house. Evelyn was in the kitchen. Bridgette, Demetrius, Deonandrea, and Dontay were downstairs in the basement. Demetrius heard a loud noise from upstairs and went to see what had happened. On his way, he passed Lyons coming down the stairs carrying a shotgun. Demetrius saw his grandmother lying on the kitchen floor and ran to his room. In the basement, Lyons shot Dontay once and shot Bridgette once.

Lyons then drove to the house where his half-brother, Jerry DePree, was staying. Lyons asked DePree to follow him to the

house of his friends John and Gail Carter so that he could drop off his truck. Upon arriving at the Carters's house, Lyons went in to talk to Gail. He told her that he had killed Bridgette and Evelyn and that he had shot Dontay by accident. Lyons went back outside and transferred the shotgun and duffel bag from his truck to DePree's car. Lyons got into DePree's car and told him to drive away. DePree asked him what was wrong, and Lyons told him that he had shot some people and that the police would probably be looking for him. DePree dropped Lyons off at Trail of Tears State Park. Lyons left his shotgun in DePree's car.

Back at Evelyn Sparks's house, another of Evelyn's daughters arrived around 11 a.m. She found her mother on the kitchen floor and called the police. The police discovered Bridgette and Dontay in the basement. All three were dead. Evelyn died from massive hemorrhaging and tissue destruction caused by a gunshot wound above her left hip. Bridgette died from massive hemorrhaging and tissue destruction caused by a gunshot wound below her right shoulder. Dontay died from extensive brain tissue damage secondary to a contact gunshot wound to the left eye.

When DePree learned later in the day that Evelyn, Bridgette, and Dontay had been shot to death, he turned over Lyons's shotgun to the police. The shell casing found in the shotgun and the two shell casings found at Evelyn's house matched the shell casings of cartridges fired from the shotgun by the State's firearms examiner.

Lyons was arrested in the afternoon and confessed to shooting Evelyn, Bridgette, and Dontay that morning. At trial, the jury found Lyons guilty of murder in the first degree for the deaths of Evelyn Sparks and Bridgette Harris and guilty of involuntary manslaughter for the death of Dontay Harris. The jury could not agree on a punishment for the murder of Evelyn Sparks. The

jury recommended a sentence of death for the murder of Bridgette Harris and seven years incarceration for the death of Dontay Harris. The trial court sentenced Lyons to death for the murder of Evelyn Sparks and accepted the jury's recommendations as to the deaths of Bridgette and Dontay. This appeal follows.

## II. MOTION TO SUPPRESS

■ Lyons claims that the trial court erred in overruling his motion to suppress the audiotaped interrogation conducted at the police station following his arrest. A trial court's ruling on a motion to suppress will not be upset on review if the ruling is supported by substantial evidence. *State v. Feltrop*, 803 S.W.2d 1, 12 (Mo. banc 1991).

■ Lyons maintains that his statement was not voluntary as he was interrogated without an attorney present after invoking his right to counsel. Once the voluntary nature of a statement is challenged, the State must prove by a preponderance of the evidence that it was freely given. *Id.* Specific to Lyons's challenge, the State had to prove that after Lyons invoked his right to counsel, he initiated further discussions with the police and knowingly and intelligently waived the right he had invoked. *See Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 492–93, 83 L.Ed.2d 488 (1984). The evidence is reviewed in the light most favorable to the ruling. *State v. Bittick*, 806 S.W.2d 652, 654 (Mo. banc 1991).

### A. Invocation of Right to Counsel

Acting on a tip from Lyons's brother, officers of the Cape Girardeau police department found Lyons in Trail of Tears State Park the afternoon of the murders. Deputy Sheriff Vince Diebold read him his *Miranda*[1] rights. Deputy Diebold asked Lyons if he understood his rights and Lyons stated that he did. In the patrol car, Lyons asked for a lawyer, invoking his right to counsel. *See*

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have a right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements.

*Smith,* 469 U.S. at 97–98, 105 S.Ct. at 493–94. Deputy Diebold did not speak to Lyons again.

## B. Initiation of Discussion

Once at the police station, Lyons was taken to the area where gunshot residue tests were performed. Detective Judy Gentry recognized Lyons and called him by name. They had met approximately ten years earlier while working at the same hotel. Det. Gentry told Lyons that she would be performing the gunshot residue test on him. Lyons asked Det. Gentry if he could call an attorney and she told him that he could do so after the test.

After the test, without prompting, Lyons stated that "he had just snapped." At this point, Det. Gentry introduced Sergeant Dennis Overbey of the Missouri Highway Patrol to Lyons as the officer who would be handling the case. Lyons then volunteered that he and Bridgette had recently been having relationship problems. Det. Gentry asked Lyons if he wanted to call an attorney and gave him a phone book. Lyons said he did not know an attorney to call. When Gentry told him that she could not advise him to call any specific attorney, Lyons stated that he did not want to call an attorney.

Lyons asked to see his sister Lily Mae. After forty-five minutes alone with his sister, Lyons stated that he needed to talk to an attorney, but did not have any money. Det. Gentry informed Lyons that he "could still call an attorney for advisement." Lyons stated that he would wait for a court-appointed attorney.

Overbey then told Lyons "that we weren't going to talk to him any more and that if he wanted to talk to us he would have to ask for us since he had mentioned he thought he needed to talk to an attorney." As Sergeant Overbey led Lyons away to the holding area, Lily Mae told Det. Gentry to tell Lyons that she would sit with him should he decide to talk to the officers. Det. Gentry stopped Lyons in the hall. Det. Gentry's testimony was that she then brought Lily Mae into the hallway so Lyons "would know that [Lily Mae] had said that [she would sit with him], and I repeated what she had said, and then she also repeated it to him." Sgt. Overbey continued with Lyons down the hall. Sgt. Overbey testified at the motion hearing that "as we went to step inside the door, [Lyons] made a statement, and I didn't really hear him, and I said, what? And he said 'I will talk to you now.'"

■ Lyons claims that when Det. Gentry told him that his sister would sit with him if he spoke with the police, she initiated interrogation in violation of *Miranda:* "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. at 474, 86 S.Ct. at 1628. Lyons also relies on *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981), "an accused ... having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."

Lyons's argument is that his taped confession is inadmissible because he did not initiate it and he had already invoked his right to counsel. As for his statement to Sgt. Overbey "I will talk to you now," Lyons claims that these words were not an initiation of further communication, exchanges, or conversations because Det. Gentry had already initiated such by relaying his sister's message.

"Custodial interrogation" was defined in *Miranda* as "questioning initiated by law enforcement officers after a person has been taken into custody...." 384 U.S. at 444, 86 S.Ct. at 1612. In *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980), the Supreme Court noted that "interrogation" under *Miranda* refers not only to express questioning, "but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police ... *should have known* were reasonably likely to elicit an incriminating response."

■ Just because Lyons decided to speak to the police some time after Det. Gentry relayed Lily Mae's message, it cannot be

concluded that Det. Gentry should have known that her actions were reasonably likely to elicit an incriminating statement from Lyons. "[P]olice surely cannot be held for the unforeseeable results of their words or actions." *Id.* Moreover, a statement unrelated to the investigation followed by a confession does not amount to interrogation. "[I]nquiries or statements . . . relating to routine incidents of the custodial relationship will not generally 'initiate' conversation in the sense in which that word was used in *Edwards.*" *Oregon v. Bradshaw,* 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983).

■ The evidence at the motion to suppress hearing supports a finding that the only words that Det. Gentry spoke to Lyons were related to the custodial nature of her relationship with Lyons. She did not initiate interrogation by telling Lyons that his sister wanted him to know that she would sit with him if he decided to speak to the police. The evidence also supports a finding that when Lyons said "I will talk to you now," he did initiate conversation with the police concerning their investigation.

### C. Knowing and Intelligent Waiver of Right to Counsel

■ When an accused initiates an interrogation after invoking his right to counsel, it must then be determined:

> whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

*Edwards,* 451 U.S. at 486 n. 9, 101 S.Ct. at 1885 n. 9.

After Lyons stated that he wanted to speak about the murders, Lyons was advised of his *Miranda* rights for the second time. Sgt. Overbey advised him using the Missouri Highway Patrol's "Participatory Rights Advisement" questionnaire. Lyons answered all of the questions and then signed the form beneath the following paragraph:

> I understand all of the questions above. I have read everything on this page, including my truthful answers. I was allowed to make any changes I wished to make. I wish to continue the procedure without an attorney. I am here of my own free will. I know that I can leave by merely telling *Dennis Overbey/Judy Gentry* that I wish to leave.

Lyons was then advised of his *Miranda* rights for a third time. This time the advisement was conducted by Det. Gentry using the Cape Girardeau police department's "Advice of Rights" form. Det. Gentry and Sgt. Overbey then proceeded to interview Lyons on audiotape. The interview began with the following exchange:

Q: Andrew were you advised of your rights?

A: Yes.

Q: Do you understand those rights?

A: Yes.

Q: Are you willing to talk to us now about the incident?

A: Yes.

■ Lyons contends that he was not competent at the time of his arrest, and therefore, he could not have knowingly and intelligently waived his rights. In support of this claim, he offers the trial court's subsequent suspension of criminal proceedings upon finding that he was mentally incompetent to stand trial due to depression. As this finding was made seven months after Lyons confessed, it is not relevant to his competence at the time he waived his right to counsel at the police station. Moreover, a deficient mental condition does not by itself render a confession involuntary, as there is no constitutional right to confess "only when totally rational and properly motivated." *Colorado v. Connelly,* 479 U.S. 157, 166, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986). At the motion to suppress, there was no direct evidence that, at the time of the interrogation, Lyons did not understand that he had the right to remain silent and that anything that he said could be used as evidence against him. *See Colorado v. Spring,* 479 U.S. 564, 574, 107 S.Ct. 851, 857–58, 93 L.Ed.2d 954

(1987); *State v. Powell,* 798 S.W.2d 709, 712 (Mo. banc 1990).

The evidence was that the officers involved were careful and thorough in informing Lyons of his rights, specifically that he had the right to have an attorney present and that, even after waiving that right, he could stop speaking and invoke the right again at any time. The entire waiver process was conducted twice, with two different forms. Both of the forms involved Lyons's active participation. Lyons repeatedly stated that he understood his rights and wished to speak without an attorney present.

 The record supports a finding that the State proved by a preponderance of the evidence that the confession was voluntary, knowing, and intelligent. The trial court did not err in overruling Lyons's motion to suppress.

When the audiotaped confession was introduced during the guilt phase of the trial, Lyons renewed his objections without additional argument. The trial court did not abuse its discretion in allowing the confession into evidence at trial. *See State v. Parkhurst,* 845 S.W.2d 31, 36 (Mo. banc 1992).

### III. VOIR DIRE

Lyons asserts that the trial court erred by sustaining the State's challenges for cause against fourteen veniremembers. Lyons objected to all fourteen strikes as they occurred and in the motion for new trial. Each challenge was based on statements by these veniremembers regarding their views on the death penalty.

 It is well-settled that a general aversion to the death penalty does not by itself disqualify a veniremember. *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968). Cause for removal exists if a prospective juror's views on capital punishment would "prevent or substantially impair the performance of [that person's] duties as a juror in accordance with [the jury] instructions and [the juror's] oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). A pro-spective juror's qualifications are not conclusively determined by any single response, but from the entire voir dire examination. *State v. Kreutzer,* 928 S.W.2d 854, 866 (Mo. banc 1996); *State v. Brown,* 902 S.W.2d 278, 285 (Mo. banc 1995). As the trial court has the benefit of evaluating firsthand the demeanor and responses of each veniremember as the voir dire progresses, the trial court's ruling on whether a veniremember is committed to follow the law will not be disturbed absent a finding of abuse of discretion. *Wainwright,* 469 U.S. at 424–26, 105 S.Ct. at 852–53; *Kreutzer,* 928 S.W.2d at 866.

**A. Veniremembers Baker, Coppage, Gosche, Hornback, Johnson, McClinton, Miles, Sloan, Sterling, and Wibbenmeyer**

In the case of ten of these fourteen veniremembers, the entire voir dire consisted of a single question by the prosecutor and one response. The defense did not attempt to rehabilitate any of these veniremembers. The prosecutor asked of the venirepanel:

> Do you know for a fact that your feelings against the death penalty are so strong that you could never ever under any circumstances vote in favor of the death penalty in any case, no matter what the facts?

This question and slight variations thereof elicited the following responses:

VENIREMAN BAKER: Yes.

. . .

VENIREMAN COPPAGE: Yes.

. . .

VENIREMAN GOSCHE: That's right.

. . .

VENIREMAN HORNBACK: Yes, sir, that's correct.

. . .

VENIREMAN JOHNSON: Yes.

. . .

VENIREMAN McCLINTON: Yes, sir.

. . .

VENIREMAN MILES: Yes.

. . .

VENIREMAN SLOAN: Yes, sir.

. . .

VENIREMAN STERLING: Yes, sir.

. . .

VENIREMAN WIBBENMEYER: I couldn't do that.

█ Even though the challenges for cause were sustained on the basis of a single word in some cases, that single word was an admission that the veniremember would not, under any circumstances, vote for the death penalty. A juror must be able to consider the full range of punishments available at law. *State v. Murray,* 744 S.W.2d 762, 768 (Mo. banc 1988); *See Witherspoon,* 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21.

Lyons contends that for the purposes of voir dire, the death penalty should not be considered as being within the range of available penalties for first-degree murder, as there are no circumstances in which the death penalty is mandatory. He relies on *§ 565.030.4(4),*[2] which states that the jury may return a recommendation of life imprisonment without probation or parole despite a finding of an aggravating circumstance or a finding that the aggravating factors outweigh the mitigating. Lyons also relies on the following quote from *State v. Petary,* 790 S.W.2d 243, 246 (Mo. banc 1990): "a juror may vote against a death sentence without having a reason." This authority is accurately quoted, but it does not support Lyons's proposition.

█ While the jury may reject the sentence of death in any case, and may do so without stating its justification on the record, it remains that each juror must be impartial and able to consider the death penalty in a case in which it is sought. These ten veniremembers stated that they could not. Therefore, they could not perform the duties required of a juror in a capital trial. In the context of the entire voir dire of this case, the trial court did not abuse its discretion in sustaining the State's challenges for cause.

### B. Veniremember Bollinger

The prosecutor asked Veniremember Bollinger the same introductory question as discussed above. She responded that she could

never consider the death penalty, no matter how horrible the crime. Defense counsel then asked of the panel:

> If you found a person guilty of murder in the first degree, you have already made that determination, now is there anybody in this first row here that would automatically say the death penalty and only the death penalty, and would not consider a sentence of life in prison without parole or probation?

Ms. Bollinger responded affirmatively, but then admitted that she had misunderstood defense counsel's question. Then the following exchange took place:

Q: . . . did you tell us here in the courtroom that you would never be able to sentence a person to death?

A: Yes, ma'am.

Q: Is that still your position?

A: Yes.

Q: And nothing we could ever do would make you consider a sentence of death?

A: I will not be a hand to anything like that.

█ The entirety of Bollinger's voir dire demonstrates that she could not perform the duties of a juror in a capital case, namely, consider the death penalty. The trial court did not abuse its discretion in sustaining the State's challenge for cause against her.

### C. Veniremember Collins

█ Veniremember Collins expressed her views on the death penalty before either counsel questioned the panel on the subject. The court asked of the panel, "Is there anybody that has a problem that would not permit them to do that week of service?" Collins responded:

A: Yes, I feel I am not in a position to stand in judgment of any man.

Q: Is it for religious reasons?

A: Yes.

Q: Counsel, do you want to accept the strike?

---

**2.** All statutory references are to RSMo (1994).

Defense counsel requested the chance to be able to inquire further. The court granted the request. Then the prosecutor asked Collins a variation of the standard question discussed above, if her position was "no matter how horrible a crime was, [she knew] for a fact that [she] could never consider imposing the death penalty on another person?" Collins answered affirmatively. The trial court did not abuse its discretion by sustaining the State's challenge for cause against Collins.

### D. Veniremember Dirnberger

When the prosecutor recited the same question to Veniremember Dirnberger, she stated that she could consider the death penalty. On the issue of burden of proof, however, Dirnberger equivocated. When defense counsel asked the panel "How many of you feel that [Lyons] is more likely guilty of murder first degree because we are already talking to you about the sentencing?" Dirnberger raised her hand and replied "yes." But later, Dirnberger stated that she understood that she was being questioned as to only the hypothetical scenario of Lyons being found guilty.

■ Though Dirnberger responded that she could consider the death penalty, it was the State that moved to strike her for cause. Any one response is not dispositive of a juror's qualifications. *State v. Garrett*, 627 S.W.2d 635, 642 (Mo. banc 1982). Every defendant has a right to jurors who will follow the law. *State v. Smith*, 649 S.W.2d 417, 422 (Mo. banc 1983). Dirnberger's answer that she understood the hypothetical nature of the sentencing questions did not entirely rehabilitate her admission that she would hold the State to a lesser burden of proof. The record does not support Lyons's claim that the trial court abused its discretion in sustaining the motion to strike Dirnberger for cause.

### E. Veniremember Emerson

■ Veniremember Emerson answered the prosecutor's standard initial question by saying that he did not believe in capital punishment. Defense counsel later asked him, "And you don't know whether or not you could follow the Court's instructions?"

Emerson replied, "Right." As Emerson's views would have substantially if not completely prevented him from performing the duties of a juror in a capital case, the trial court did not abuse its discretion in sustaining the State's challenge for cause against him.

### IV. PENALTY PHASE

#### A. Excerpt of Videotape of Demetrius's Statement

■ Lyons alleges that the trial court improperly admitted an excerpt from the videotaped statement that Demetrius, Bridgette's seven-year old son, gave to the police the day of the murders. The admission of evidence is reviewed for abuse of discretion. *State v. Parkhurst*, 845 S.W.2d 31, 36 (Mo. banc 1992).

Demetrius testified for the State during the guilt phase. He testified that after hearing one shot, he went up the stairs to the kitchen, passing Lyons going down to the basement with a shotgun. After finding his grandmother Evelyn on the kitchen floor, he ran up to the second floor. He heard two more shots. His sister Deonandrea joined him moments later. While hiding with her underneath a bed, Demetrius heard Lyons come upstairs. The prosecutor asked Demetrius if he remembered hearing anybody speaking while he was under the bed. Demetrius replied that he did not, that the next thing he remembered was hearing the closing of a door.

Four years earlier, on the day of the murders, Demetrius told Officer Phillip Gregory during a videotaped interview that he had heard Lyons say something:

> Demetrius: Me and Deonandrea was hiding under the bed because I thought he was gonna shoot us. Me and Deonandrea hiding under the bed, so ... he came in the room and said "Where them kids at?" Then when he couldn't find us ... he left.
>
> Officer Gregory: So you guys hid under the bed?
>
> Demetrius: Mmm-hmm ... he couldn't find us.

The State sought to play these twenty seconds of videotape during the penalty phase as a prior inconsistent statement. Lyons objected on the grounds that a proper foundation had not been laid. He also objected to the youth of Demetrius at the time he gave the statement. Lyons's objection was overruled, and the videotape was shown to the jury.

### 1. Foundation

■ "Whether an inconsistency exists between trial testimony and statements made prior to trial is to be determined by the whole impression and effect of what has been said and done." *State v. Blankenship*, 830 S.W.2d 1, 9 (Mo. banc 1992). Lyons does not question whether Demetrius's out-of-court statement was inconsistent with his trial testimony. This Court, therefore, assumes the inconsistency for the purpose of evaluating Lyons's claim of lack of foundation.

The foundational requirements for § 491.074 statements were addressed in *State v. Bowman*, 741 S.W.2d 10, 13–14 (Mo. banc 1987):

> The old rule about [the proper foundation to] impeach[ ] ... one's own witness is inappropriate, in view of the statute. Inconsistent statements are available as substantive evidence, and may be used just as soon as the inconsistency appears from the testimony. The only necessary foundation is the inquiry as to whether the witness made the statement ... and whether the statement is true. Any requirement of additional foundation would dilute the effect of the statute.

(footnote omitted).

The State presented the court with Demetrius's guilt-phase testimony that he did not hear any talking while he was hiding under the bed. Officer Gregory testified that he had interviewed Demetrius on videotape the day of the murders. He stated that the excerpt the State sought to admit into evidence was a true and accurate copy of Demetrius "saying something to the effect of 'Where are them kids at.'" What the State did not do, though the court offered on the record to bring Demetrius back for the pen-

alty phase, was put Demetrius on the stand to affirm or deny the truth of the statement.

■ Even assuming that the State's foundation was insufficient, such an error does not require reversal unless so prejudicial that it deprived the defendant of a fair trial. *State v. McMillin*, 783 S.W.2d 82, 98 (Mo. banc 1990). Lyons alleges that if the State had put Demetrius back on the stand during the penalty phase "one can only speculate as to what he would have responded." This allegation falls short of demonstrating prejudice.

■ While it is true that one of the foundational requirements of *Bowman* is an inquiry into the truth of the statement, a § 491.074 statement is admissible regardless of the declarant's answer as to its verity. *See Bowman*, 741 S.W.2d at 14 (affirming admission of prior inconsistent statement even though at trial declarant said it was a coerced lie); *State v. Jennings*, 815 S.W.2d 434, 443 (Mo.App.1991); *State v. Belk*, 759 S.W.2d 257, 259 (Mo.App.1988). The jury makes the ultimate decision as to the credibility of the § 491.074 statement. *Bowman*, 741 S.W.2d at 14. Therefore, the statement would have been admissible even if the State had recalled Demetrius and he swore under oath that the videotaped statement was a lie. Any technical deficiency in foundation was not prejudicial.

■ On a related issue, Lyons claims that when the State was presenting its foundation for the videotape, Officer Gregory's testimony as to what was on the tape was improper bolstering. Lyons relies on a statement from *State v. Seever*, 733 S.W.2d 438, 441 (Mo. banc 1987), "When a witness testifies from the stand, the use of duplicating and corroborative extrajudicial statements is substantially restricted." His reliance is misplaced. The rule in *Seever* restricts the use of extrajudicial statements *consistent* with in-court testimony. It is not a rule about the foundation for prior inconsistent statements.

### 2. Age

■ Lyons also objected on the grounds that Demetrius's young age at the time he

talked to the police prevented the tape from being admitted. This Court affirms the admission of the statement.

The State introduced the videotaped excerpt under § 491.074, the statute that deals specifically with prior inconsistent statements in a murder trial:

Notwithstanding any other provisions of law to the contrary, a prior inconsistent statement of any witness testifying in the trial of an offense under chapter 565, 566 or 568, RSMo, shall be received as substantive evidence, and the party offering the prior inconsistent statement may argue the truth of such statement.

The legislature enacted a special statute to govern the admission of prior inconsistent statements in cases involving the most serious and violent crimes and the severest punishments in our criminal code.[3] The language in the statute is clear. In the trial of a chapter 565 offense, the prior inconsistent statement of "*any* witness testifying in the trial ... shall be received as substantive evidence" "*[n]otwithstanding any other provisions of law to the contrary.*" (emphasis added). Demetrius testified at trial. Therefore, any prior inconsistent statements are admissible solely on this basis.

Credibility issues—such as youth—are to be considered by the jury while weighing the out-of-court § 491.074 statement against the in-court testimony of a witness. *See Bowman*, 741 S.W.2d at 14.

### B. Closing Argument

▮ Lyons argues that comments made by the prosecutor during closing argument deprived him of a fair trial. Both parties have wide latitude in arguing during the penalty phase of a first-degree murder case. *State v. Shurn*, 866 S.W.2d 447, 463 (Mo. banc 1993).

#### 1. Preserved Claims

▮ When the court allows argument over defense counsel's objection, "the rulings are reversible only for abuse of discretion

where argument is plainly unwarranted." *State v. Weaver*, 912 S.W.2d 499, 512 (Mo. banc 1995).

▮ Lyons objected to the prosecutor's statement, "If you let him get off the hook without the death penalty, you will be sending the wrong message." It is proper for prosecutors to argue for the death penalty by requesting that the jury send a message of intolerance to the community. *State v. Smith*, 944 S.W.2d 901, 919 (Mo. banc 1997).

Lyons also objected to the following rebuttal argument:

Remember the Hatfields and the McCoys? It is born out from American history ... The Hatfields an [sic] the McCoys is an example of retribution where a Hatfield killed a McCoy, a McCoy killed a Hatfield, and this feud went on for years with people killing each other until finally the state national guard was called out to help law enforcement to stop the problem.

Ladies and gentlemen, the reason the criminal justice system has retribution is it takes the punishment factor and gives it to the government to impose so the family don't [sic] do it themselves. I am sure that some victims—

\* \* \* \* \* \*

Because our criminal justice system has capacity for retribution, the family does not have to take justice in their own hands. The families look to see and say, "Will justice be done?" This man took three lives. He committed the ultimate crime. Will he receive the ultimate punishment, and will justice be done and will he be given the ultimate penalty?

▮ Lyons argues that this argument makes reference to facts not before the jury. It is clear that the prosecutor was not introducing the Hatfield–McCoy feud as new evidence in closing argument, but as an illustration of the theory of retribution. Explaining legal theories of justification for the death penalty is proper argument. *State v. Ramsey*, 864 S.W.2d 320, 332 (Mo. banc 1993).

---

**3.** Chapter 565, "Offenses Against the Person;" chapter 566, "Sexual Offenses;" chapter 568,

"Offenses Against the Family."

Isolated references to famous people in the context of describing a legal theory is not reversible error. *See Shurn,* 866 S.W.2d at 464.

■ Lyons also argues that the above argument amounted to improper personalization. "An argument is not personalized where it does not suggest a personal danger to the jury or their families if the defendant were to be acquitted." *State v. Copeland,* 928 S.W.2d 828, 842 (Mo. banc 1996). The prosecutor was explaining retribution in the hypothetical context of the victim's family retaliating against the defendant. No reference was made to any of the jurors or their families.

Lyons next asserts that the following comments were inflammatory and improperly personalized:

Some people describe the criminal justice system as a chain and say it is only as strong as its weakest link.

 \* \* \* \* \* \*

In this case we have witnesses who reported the crime. Friends who did their duties and told about the threats he made. The police made a good case. The prosecutors have worked as hard as we can. You, the jury have a role, please don't be a weak link.

■ The use of the word "you" does not automatically amount to improper personalization. *State v. Richardson,* 923 S.W.2d 301, 323 (Mo. banc 1996). Again, there is no reference to the jurors or their families being in danger. It is proper to speak to the jury of the importance of its role in the criminal justice system. *Id.* at 322. The court did not err in overruling Lyons's objections.

## 2. Plain Error Review

■ The remainder of Lyons's claims are reviewed for plain error as he made no objection at trial. If there is no objection or request for relief concerning a closing argument, the trial court's options are narrowed to "uninvited interference with summation and a corresponding increase of error by such intervention." *State v. Clemmons,* 753 S.W.2d 901, 908 (Mo. banc 1988). Conse-

quently, a conviction will be reversed for improper argument on plain error review only if it is established that the comments had a decisive effect on the outcome of the trial, amounting to manifest injustice. *Id.*

■ Lyons contends that the following comments misstated the law:

[If you do not return a verdict of death] You will be saying depressed, unhappy, all right, you have got immunity from the death penalty, go ahead and take that shotgun, blow away three people. If you are depressed, you have immunity from the death penalty.

The prosecutor clearly was not suggesting that the current state of the law grants people suffering from depression the right to kill without consequence. The above comments reflect the grave circumstances surrounding a triple homicide. It is proper argument for the prosecutor to urge the jury to impose the most severe penalty available at law. *Smith,* 944 S.W.2d at 919.

■ Lyons also now objects to this portion of the prosecutor's closing argument:

If this crime doesn't deserve the death penalty, then what crime does?

If this criminal does not deserve the death penalty, what criminal would?

 \* \* \* \* \* \*

Should [he] not get it because he's depressed on several different occasions over his years?

Well, ladies and gentlemen, I submit to you that there are not a lot of happy triple murderers going around out there. There are not a lot of happy people committing multiple murders. Depression shouldn't be considered a ticket to have immunity from the death penalty.

Lyons suggests that these comments improperly compared Lyons and his crimes to other criminals and their crimes. This line of argument does not constitute reversible error. *Shurn,* 866 S.W.2d at 463.

## C. Instructions

Lyons alleges that the following sequence of events resulted in an arbitrary and capri-

cious sentence of death for the murder of Bridgette Harris. At the beginning of the penalty phase, the court read the following instructions to the jury:

## INSTRUCTION NO. 18

The law applicable to this stage of the trial is stated in these instructions and Instructions No. 1 and 2 which the Court read to you during the first stage of the trial. All of these instructions will be given to you to take to your jury room for use during your deliberations on punishment.

You must not single out certain instructions and disregard others or question the wisdom of any rule of law.

The Court does not mean to assume as true any fact referred to in these instructions but leaves it to you to determine what the facts are.

In these instructions, you are told that, in order to consider the death penalty, you must find beyond a reasonable doubt certain propositions relating to aggravating circumstances. The burden of causing you to find these propositions beyond a reasonable doubt is upon the state.

A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the truth of a proposition. The law does not require proof that overcomes every possible doubt. If, after your consideration of all the evidence, you are firmly convinced that a proposition is true, then you may so find. If you are not so convinced, you must give the defendant the benefit of the doubt and must not find such proposition to be true.

*MAI–CR3d 313.30B.*

## INSTRUCTION NO. 19

On Counts I and II, you found the defendant guilty of murder in the first degree. At this stage of the trial it will be your duty to determine within the limits prescribed by law the punishment which must be imposed for each offense.

The punishment prescribed by law for murder in the first degree is either death or imprisonment for life by the Division of Corrections without eligibility for probation or parole.

*MAI–CR3d 313.31.*

## INSTRUCTION NO. 20

On Count III, you found the defendant guilty of involuntary manslaughter. At this stage of the trial it will be your duty to determine within the limits prescribed by the law the punishment which must be imposed for that offense.

The punishment prescribed by law for involuntary manslaughter is one of the following punishments:

1. Imprisonment for a term of years fixed by you, but not less than one year and not to exceed seven years.

2. Imprisonment in the county jail for a term fixed by you, but not to exceed one year.

3. Imprisonment for a term of years fixed by you, but not less than one year and not to exceed seven years and in addition a fine, the amount to be determined by the Court.

4. Imprisonment in the county jail for a term fixed by you, but not to exceed one year and in addition a fine, the amount to be determined by the court.

5. No imprisonment but a fine, in an amount to be determined by the court.

The maximum fine which the court may impose is $5,000.00[.]

*See MAI–CR3d 313.10; §§ 565.024, 558.011, 560.011.*

After both parties made their opening arguments and presented their evidence, the court again read Instructions 18, 19, and 20. The court then read the following instruction to the jury:

## INSTRUCTION NO. 21

At this stage of the trial, the law requires that certain circumstances be considered in making your decision as to the punishment to be imposed. We will proceed as follows:

First, the attorneys will have an opportunity to make a statement outlining any additional evidence to be presented. Such evidence may then be introduced.

After that, the Court will instruct you as to the circumstances you should consider in determining the punishment.

Then the attorneys may make their arguments.

You will then go to the jury room, deliberate, and arrive at your verdict.

*MAI–CR3d 313.32.*

At this point, the court read to the jury the remaining ten instructions, to which Lyons makes no challenge. Each party made their closing argument, and the jury retired at 6:22 p.m. At 9:19 p.m., the jury sent a note to the court requesting the guidelines for the sentencing of Count III, the involuntary manslaughter of Dontay Harris. The court's record indicated that all of the written instructions had been sent to the jury when they retired, including Instruction No. 20, which contained the range of punishments for involuntary manslaughter. The court responded in writing, "Please make sure you have 18, 19, 20 and 21. If so, refer to No. 20."

It was then discovered that Instructions 18–21 had not been sent to the jury. The court directed the bailiff to deliver them immediately. The court asked counsel if either party would like to make any record on that action. No one responded. Twenty minutes later, the jurors communicated to the court that they were ready to return. Lyons moved for a mistrial, and was overruled.

Lyons alleges that the initial absence of these four written instructions violated *Rule 28.02,* constituting error. *Rule 28.02(a)* reads: "In every trial for a criminal offense the court shall instruct the jury in writing upon all questions of law arising in the case that are necessary for their information in giving the verdict." *Rule 28.02(e)* instructs, "The original of all numbered instructions and all verdict forms shall be handed to the jury for its use during its deliberation ..." Instruction No. 18 states, "All of these instructions will be given to you to take to your jury room for use during your deliberations on punishment." *MAI–CR3d 313.30B.*

Although technically the jury did eventually receive all the proper written instructions during their deliberations, we will assume error in order to evaluate Lyons's claim of prejudice. *Rule 28.02(f).* Lyons maintains that he was prejudiced by the jury's "unchannelled ... unguided and unfettered" deliberations during the three hours prior to the receipt of the written instructions.

Prejudice occurs where an error has an adverse influence on the jury. *State v. Feltrop,* 803 S.W.2d 1, 11 (Mo. banc 1991). The jury's deliberations were not unguided. The jury was twice read Instructions 18, 19, and 20 and once read Instruction 21 before eventually receiving those instructions in writing. In total, the jury was read fourteen different instructions. The jury then immediately received ten of them in writing.

Of the written instructions that were received later, Instruction 19, which stated the two possible punishments for murder in the first degree, was replicated throughout the written instructions that the jury had already received. Instruction 21 was procedural and irrelevant to the jury's deliberations, as it merely recited the order of the penalty phase proceedings *before* the jury retired.

Lyons is left to complain about the delay of the written definition of reasonable doubt in Instruction 18 and the range of punishments for involuntary manslaughter set out in Instruction 20. The twenty-one minutes that the jurors deliberated with the written form of these instructions together with every instruction used in the penalty phase prevented prejudice to Lyons. Each written instruction correctly stated the law. Jurors are presumed to follow the court's instructions. *State v. Griffin,* 756 S.W.2d 475, 488 (Mo. banc 1988). Lyons offers no other allegations of adverse effect besides tardiness. This Court finds that no prejudice was suffered.

## V. INDEPENDENT STATUTORY REVIEW

*Section 565.035.3* requires this Court to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both [sic] the crime, the strength of the evidence and the defendant.

### A. Count I—The Murder of Evelyn Sparks

After careful review of the record and transcript, this Court finds that the death verdict returned for the murder of Evelyn Sparks was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

The court found beyond a reasonable doubt that the murder of Evelyn Sparks "was committed while the offender was engaged in the commission or attempted commission of another unlawful homicide." *§ 565.032.2(2)*. The court also found that "the murder in the first degree was committed while the defendant was engaged in the perpetration ... of any degree of ... burglary.[4]" *§ 565.032.2(11)*. This Court finds that the evidence supports the trial court's finding of one statutory circumstance as required by *§ 565.030.4(1)*, and supports the other aggravating circumstance found.

Considering the crime, the strength of the evidence, and the defendant, this Court finds that the sentence is proportionate to other cases where the sentencer found beyond a reasonable doubt that the murder was committed while the offender was engaged in commission of another unlawful homicide, or that the murder was committed while the defendant was engaged in the perpetration of a burglary. *State v. Smith*, 944 S.W.2d 901 (Mo. banc 1997) (multiple homicides); *State*

*v. Smulls*, 935 S.W.2d 9 (Mo. banc 1996) (multiple homicides); *State v. Kreutzer*, 928 S.W.2d 854 (Mo. banc 1996) (burglary); *State v. Richardson*, 923 S.W.2d 301 (Mo. banc 1996) (multiple homicides); *State v. Tokar*, 918 S.W.2d 753 (Mo. banc 1996) (burglary); *State v. Gray*, 887 S.W.2d 369 (Mo. banc 1994) (multiple homicides); *State v. Griffin*, 756 S.W.2d 475 (Mo. banc 1988) (multiple homicides, burglary); *State v. Schneider*, 736 S.W.2d 392 (Mo. banc 1987) (multiple homicides, burglary).

### B. Count II—The Murder of Bridgette Harris

This Court finds that there is no suggestion in the record that the death verdict returned for the murder of Bridgette Harris was imposed under the influence of passion, prejudice, or any other arbitrary factor.

The jury found three statutory aggravating factors beyond a reasonable doubt: (1) that her murder was committed while the defendant was engaged in the commission of the unlawful homicide of Evelyn Sparks; (2) that her murder was committed while the defendant was engaged in the commission of the unlawful homicide of Dontay Harris; and (3) that her murder was committed while the defendant was engaged in the perpetration of burglary. *§ 565.032.2(2), (11)*. The evidence supports the trial court's finding of one statutory circumstance as required by *§ 565.030.4(1)* and supports the other aggravating circumstances found.

Considering the crime, the strength of the evidence, and the defendant, this Court finds that the sentence is proportionate to the above-cited cases where the sentencer found beyond a reasonable doubt that the murder was committed while the offender was engaged in commission of another unlawful homicide, or the murder was committed while the defendant was engaged in the perpetration of a burglary.

---

**4.** "A person commits the crime of burglary in the second degree when he knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable structure for the purpose of committing a crime therein." *§ 569.170.1*. In this case the "crime therein" was the murder of Evelyn Sparks. A person "'enters unlawfully or remains unlawfully' in or upon premises when he is not licensed or privileged to do so." *§ 569.010(8)*.

## VI. CONCLUSION

For all of the foregoing reasons, the judgments are affirmed.

All concur.