# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3183

_____

Andrew Lyons,

   Appellant,

  v.

Al Luebbers,

   Appellee.

\*
\*
\*
\*
\* Appeal from the United States
\* District Court for the Eastern
\* District of Missouri.
\*
\*
\*

_____

Submitted: November 15, 2004
Filed: April 11, 2005

_____

Before RILEY, JOHN R. GIBSON, and GRUENDER, Circuit Judges.

_____

RILEY, Circuit Judge.

  A Missouri state court sentenced Andrew Lyons (Lyons) to death after he was convicted of two counts of first-degree murder and one count of involuntary manslaughter. The Missouri Supreme Court affirmed the convictions and sentence, and affirmed the denial of Lyons's motion for post-conviction relief. Lyons filed a timely application for habeas corpus under 28 U.S.C. § 2254. The district court[1] denied habeas relief, concluding (1) Lyons was competent to stand trial, (2) Lyons

_____

  [1]The Honorable Charles A. Shaw, United States District Judge for the Eastern District of Missouri.

failed to show he received ineffective assistance of counsel, and (3) any error the trial court made in admitting Lyons's confession at trial was harmless. We affirm.

## I.  BACKGROUND

In September 1992, Lyons lived in Cape Girardeau, Missouri, with Bridgette Harris (Harris) and their eleven-month-old son, Dontay; Harris's seven-year-old son, Demetrius; and Harris's four-year-old daughter, Deonandrea. The relationship between Lyons and Harris deteriorated. Lyons told his long-time friend Roger McNeely he felt like killing Harris, and the "best thing" for Harris to do would be "to get killed or be killed." On September 18, Lyons and Harris separated. Harris and the three children moved in with Harris's mother, Evelyna Sparks (Sparks). Lyons later saw Harris and her sister, Evelyn, walking from Sparks's house to Harris's house. Lyons pulled up in his truck, threw his house keys at Harris, and pulled the front seat of the truck forward, revealing a shotgun. Harris and Evelyn "took off running."

The next day, Lyons told Harris's best friend, Verna Wiseman, he was "tired of them," pointing to Evelyn's house, interfering in his and Harris's relationship. Lyons stated he would "end up killing them." Later that day, Lyons told another long-time friend, Roscoe Newbern, Jr., that Lyons was having problems with Harris and that Sparks should stop interfering, or Lyons would kill Sparks. Late at night on September 19, 1992, Lyons told his friend, Larry Jackson (Jackson), he was tired of Sparks's involvement in Lyons's personal business and was tired of finding the children home alone. Lyons told Jackson he was going to use a shotgun to kill Sparks, Harris, and Evelyn, then catch a train out of town. Jackson told Lyons to think about what he was saying, and the two talked for two to three hours.

Early Sunday morning, September 20, Lyons had an argument with Harris at Sparks's house. Lyons then left the house. Harris and the children had been sleeping in Sparks's basement and were still in the basement. Sparks, who was upstairs, spoke

to a friend by telephone a little after 8:00 a.m., and again shortly after 10:00 a.m. From the basement, Demetrius heard a loud noise that sounded like a shot, and Harris told Demetrius to go upstairs to see what happened. As Demetrius went up the stairs, he met Lyons coming down the stairs with a shotgun, and Demetrius recognized the shotgun as belonging to Lyons. When Demetrius arrived upstairs in the kitchen, he saw his grandmother, Sparks, lying on the floor and not moving. After Lyons went downstairs, Deonandrea joined Demetrius upstairs. Hearing two more shots, Deonandrea and Demetrius hid under a bed until Lyons left. Evelyn stopped by the house later Sunday, and Deonandrea and Demetrius then came out of the bedroom. When Evelyn asked about Sparks, Demetrius said she was dead and Lyons had shot her. Evelyn found her mother, Sparks, lying on the kitchen floor and called the police. Police arrived and discovered both Sparks and Harris had been killed by gunshot wounds inflicted from a distance of twenty to forty-two inches. Eleven-month-old Dontay was found dead with a gunshot wound to his left eye that "had split the sides of the skull and blew the back of [his] head out."

After the shootings, Lyons contacted his half-brother, Jerry DePree (DePree), for a ride and told DePree to meet him at John and Gail (Gail) Carter's house. When Lyons arrived at the Carters' house, he told Gail he had killed Sparks, Harris, and Sparks's boyfriend, and that he had killed Dontay by accident. When DePree arrived, Lyons put his shotgun in DePree's car and told DePree he had "done some shooting." Lyons told DePree to drop him off at the Trail of Tears State Park (State Park). Lyons also told DePree to keep the shotgun, to pick up his check for him, but not to drive Lyons's vehicles because the police would be looking for them. Lastly, Lyons told DePree not to tell anyone where Lyons could be found. DePree later turned in the shotgun to the Cape Girardeau Police Department. Examination of the gun revealed it was the shotgun that fired the shots that killed Sparks, Harris, and Dontay.

Lyons was arrested that afternoon at 3:15 p.m. at the State Park. When law enforcement arrived at the park, Lyons fled from the officers towards the woods, but

halted when the officers threatened to shoot. The arresting officers advised Lyons of his <u>Miranda</u> rights[2] at the time of his arrest, and Lyons stated he understood those rights. The only interrogation question from law enforcement was "what [Lyons] had done with the gun." Lyons said he threw the gun in the river. After being placed in Deputy Vincent Diebold's (Deputy Diebold) car, Lyons asked, "Can I get a lawyer?" Deputy Diebold responded that Lyons could get an attorney. Without any questioning from Deputy Diebold, Lyons asked, "Didn't nobody die, did they?" When Deputy Diebold responded affirmatively, Lyons asked if "all of them" had died.

At the police station, Lyons asked Detective Judy Gentry (Detective Gentry) if he could call an attorney. After Detective Gentry told Lyons he could, and without questioning from Detective Gentry, Lyons stated he "just snapped" and "didn't plan on this." Detective Gentry then gave Lyons a telephone book to find an attorney to call. Lyons then decided he did not want to talk to an attorney, but wanted to call his sister, Lily Mae Foster (Foster). After Lyons called Foster, and while she was en route to the station, Lyons initiated a conversation with Detective Gentry about Harris, her family, Harris's mistreatment of Lyons and the children, Harris's use of drugs, and the problems he and Harris had been having. Detective Gentry introduced Lyons to Trooper Dennis Overbey (Trooper Overbey). Lyons stated he would talk to Trooper Overbey, but that he first wanted to talk to Foster.

---

[2]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). The arresting officer read from a <u>Miranda</u> rights card, advising Lyons: "You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to have a lawyer, one will be appointed for you before any questioning if you wish. You can decide at any time to exercise these rights and not make any statements[.]"

When Foster arrived, she and Lyons met in an interview room. After about forty-five minutes, Detective Gentry asked Lyons if he wanted to talk to Foster longer or if he was ready to talk to Detective Gentry and Trooper Overbey. Lyons stated he already had told Detective Gentry and his sister what happened, and Detective Gentry pointed out she had not yet asked Lyons any questions about the incident.

Either Lyons or Foster then stated they wanted to talk to an attorney, and Detective Gentry said she would retrieve a telephone book. When Lyons stated he could not afford an attorney, Detective Gentry told Lyons he could get a court-appointed attorney. Lyons stated he would wait until he went to court.

Detective Gentry then told Lyons she would not contact him again because he had requested an attorney, and if Lyons wanted to talk to her, he would have to initiate contact. Ten minutes later, Detective Gentry, Trooper Overbey, and Detective Keith May (Detective May) returned to take Lyons to his holding cell. As Trooper Overbey and Detective May escorted Lyons, Foster asked Detective Gentry to tell Lyons she would come back if he wanted to talk with the police. Detective Gentry brought Lyons back to Foster, and Detective Gentry and Foster each told Lyons that Foster would come back and sit with Lyons if he decided to talk with the police. Lyons again was informed he would have to initiate any contact with the police since he had requested an attorney.

As Lyons was placed in a holding cell, he told Trooper Overbey he wanted to talk. Detective Gentry was notified and she returned to the holding cell. Trooper Overbey again advised Lyons of his <u>Miranda</u> rights. The deputies used a Participatory Miranda Rights Form, which employs a question and answer format. Lyons stated he understood his rights and wanted to make a statement. Using a Cape Girardeau Police Department Advice of Rights Form, Detective Gentry also informed Lyons of his rights. Lyons again stated he understood his rights and wished to make a statement. Lyons consented to have his statement tape-recorded. In Lyons's tape-

-5-

recorded statement, Lyons acknowledged he was advised of his rights, that he understood them, and that he wanted to talk to Detective Gentry and Trooper Overbey. Lyons also made a written statement. Lyons confessed, in specific detail, to the killings.

While in jail after arrest, Lyons attempted to electrocute himself. Lyons was then placed on suicide watch and committed to the Missouri Department of Mental Health (DMH). After Lyons was indicted, the State of Missouri (State) moved for a psychiatric examination, which the trial court granted over the objections of Lyons's counsel.[3] Two state forensic examiners, Dr. Bruce Harry (Dr. Harry) and Dr. Michael Stacy (Dr. Stacy), examined Lyons from November 2 to 19, 1992. In a report dated November 23, Drs. Harry and Stacy concluded "Lyons [did] not have the mental capacity to understand the proceedings against him [and was un]able to assist his attorney in his own defense because of his severe depression." The trial court suspended criminal proceedings and committed Lyons to the DMH's custody and care.

In November 1993, Dr. William Holcomb (Dr. Holcomb), another state forensic examiner, evaluated Lyons and concluded Lyons had "not yet regained competency to proceed with trial." Dr. Holcomb evaluated Lyons again on May 30, 1994, and concluded Lyons still suffered from depression and other psychotic features. However, Dr. Holcomb opined "that Mr. Lyons is competent to proceed with trial and especially so if his attorney can establish rapport with [him] and encourage him to participate in planning legal strategy." Dr. Holcomb also found Lyons expressed a desire "to go to court." Dr. Holcomb recommended "Lyons be found competent to proceed with trial."

---

[3]Defense counsel argued "there are no facts before this Court which constitute reasonable cause to believe that Andrew Lyons lacks mental fitness to proceed," and declared "Lyons' competency to stand trial is one closely monitored by his counsel whose obligation it is to protect his rights . . . ."

The State then filed a motion to proceed to trial. In response, defense counsel hired a private forensic psychologist, Dr. Phillip Johnson (Dr. Johnson), to evaluate Lyons. In a report dated December 12, 1994, Dr. Johnson concluded Lyons was not competent to stand trial.

On February 23, 1995, the trial court held a competency hearing, and Drs. Holcomb and Johnson testified consistently with their reports. The trial court found Lyons had the mental competence to stand trial and ordered Lyons remain hospitalized until trial.

Lyons moved to suppress his confession and statements he made after his arrest. In April 1996, the trial court conducted a hearing on the motion to suppress. At the conclusion of the hearing, the court overruled the motion to suppress.

On the eve of trial, pursuant to a request from Lyons's counsel, Dr. Harry sent a letter to counsel on April 16, 1996, describing his opinion of Lyons's mental condition. Dr. Harry did not opine that Lyons was incompetent to stand trial, but noted the troubles Lyons was having and stated Lyons might be suicidal. Lyons told Dr. Harry he wanted to proceed to trial to "get it over with." Dr. Johnson also sent a letter to counsel on April 16, 1996, in which he opined that, at the time Lyons committed the crimes, his mental illness did not render Lyons unable to appreciate the criminality of his actions or conform to the requirements of the law. Neither Lyons nor his counsel ever raised Lyons's competence again before the Missouri state courts.

Lyons's trial commenced on April 22, 1996. The State presented the evidence outlined earlier, including Lyons's taped confession, and the testimony of Demetrius, who testified about his observations on the day of the shootings. A jury found Lyons guilty of first-degree murder for killing Sparks and Harris, and involuntary manslaughter for killing Dontay. At the penalty phase, Lyons presented several

witnesses in support of mitigation of punishment. Dr. Johnson testified Lyons's depression "occurred many times over the course of [his] life," and was a "major contributor" to his behavior, but admitted Lyons's mental illness did not render him unable to appreciate the criminality of his conduct. Lyons's siblings testified to his character. Notwithstanding Lyons's attempt to avoid a sentence of death, the jury recommended Lyons be sentenced to death for murdering Harris. The jury found three statutory aggravating circumstances: (1) Lyons murdered Harris while engaged in the homicide of Sparks; (2) Lyons murdered Harris while engaged in the homicide of Dontay; and (3) Lyons murdered Harris while engaged in a burglary. The jury was unable to agree on a punishment for Sparks's murder, and recommended seven years imprisonment for the death of Dontay. The trial court then sentenced Lyons to death for the two murders, and to seven years imprisonment for killing Dontay.

Lyons appealed, and the Missouri Supreme Court affirmed Lyons's convictions and sentence. State v. Lyons, 951 S.W.2d 584 (Mo. 1997), cert. denied, 522 U.S. 1130 (1998). Lyons filed a pro se motion for post-conviction relief in the trial court, which denied relief. The Missouri Supreme Court affirmed the denial. Lyons v. State, 39 S.W.3d 32 (Mo.), cert. denied, 534 U.S. 976 (2001). Lyons next filed a 28 U.S.C. § 2254 application for habeas relief in the district court, alleging eleven constitutional violations. The district court denied the application, but granted Lyons a certificate of appealability on (1) the mental incompetence at trial claim, and (2) whether it was harmless error to receive Lyons's confession into evidence at trial even though Lyons may not have been mentally competent when he made the confession. This court expanded the certificate of appealability "to include the issue whether Mr. Lyons received effective assistance of counsel in the investigation and presentation of testimony from state mental health experts."

## II. DISCUSSION

"In an appeal of a habeas petition, '[w]e review the district court's findings of fact for clear error and its conclusions of law de novo.'" Hall v. Luebbers, 341 F.3d

706, 712 (8th Cir. 2003) (alteration in original) (citation omitted). For habeas relief under 28 U.S.C. § 2254, an applicant must demonstrate the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A federal court may not issue the writ simply because it "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 411 (2000). "In other words, the state court's application might be erroneous in our independent judgment without being 'objectively unreasonable.'" Clemons v. Luebbers, 381 F.3d 744, 750 (8th Cir. 2004) (quoting Wiggins v. Smith, 539 U.S. 510, 521 (2003)).

### A. Mental Competence to Stand Trial

Lyons argues the district court should have set aside his conviction because the evidence demonstrates he was not mentally competent to stand trial. Lyons also claims any procedural default of this claim should be excused due to his mental incompetence. Finally, Lyons contends the trial court should have revisited the competency issue at trial, fourteen months after the initial competency determination.

The State argues Lyons defaulted on this claim by failing to present it to the Missouri state courts. The State also contends, even if Lyons did not default, the trial court reasonably determined Lyons was competent to stand trial.

"It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial." Medina v. California, 505 U.S. 437, 439 (1992). To be competent to stand trial, a defendant must have "the capacity to understand the nature and object

of the proceedings against him, to consult with counsel, and to assist in preparing his defense." Drope v. Missouri, 420 U.S. 162, 171 (1975). "Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." Id. at 181. Still, "[n]ot every manifestation of mental illness demonstrates incompetence to stand trial . . . . Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." Vogt v. United States, 88 F.3d 587, 591 (8th Cir. 1996) (citation omitted). The trial court must monitor a defendant's competence during trial and "should consider (1) evidence of irrational behavior by the accused, (2) the accused's demeanor at trial, and (3) any prior medical opinion as to the mental competency of the accused to stand trial." Reynolds v. Norris, 86 F.3d 796, 800 (8th Cir. 1996). "Additionally, the trial court may consider an express doubt by the accused's attorney, although such doubt alone is not enough to establish sufficient doubt." Id.

A section 2254 applicant's failure to raise a claim in state post-conviction proceedings results in procedural default of that claim. See Sweet v. Delo, 125 F.3d 1144, 1149-50 (8th Cir. 1997). We have recognized competency issues are subject to procedural bar. Weekley v. Jones, 56 F.3d 889, 894-95 (8th Cir. 1995), aff'd in part, 76 F.3d 1459, 1461 (8th Cir. 1996) (en banc). As the State points out, regardless of how incompetent Lyons now contends he was, Lyons was represented during the state court proceedings, and Lyons's incompetence did not prevent *his counsel* from raising the competency issue. As noted above, Lyons's defense counsel expressly recognized their obligation to monitor closely Lyons's mental fitness to proceed with the trial. See n.3, supra. Thus, Lyons procedurally defaulted on this trial competency claim.

However, regardless of any default, Lyons would not prevail on the merits of the trial competency claim. "[T]he due process clause permits a state to require a

defendant to bear the burden of proving his or her own incompetence." Rhode v. Olk-Long, 84 F.3d 284, 288 (8th Cir. 1996) (citing Medina, 505 U.S. at 450-51). Lyons had the burden of persuasion to demonstrate, by a preponderance of the evidence, he was incompetent. Vogt, 88 F.3d at 591. Lyons has failed to meet this burden. Because competence to stand trial is a factual issue, see Boyd v. Delo, 999 F.2d 1286, 1289 (8th Cir. 1993), we presume the state court's finding of competence is correct, Reynolds, 86 F.3d at 800 ("On habeas review of a substantive competency claim, this court generally presumes that a state court's factual finding of competency is correct.").

The trial court's competency finding is supported by the record. Dr. Holcomb's report and testimony at the competency hearing were sufficient evidence upon which the trial court could find Lyons was competent to stand trial. Lyons did not present contrary testimony from his family members or his counsel at the competency hearing. Although Lyons contends Dr. Harry found him incompetent to stand trial, Lyons provides no reason why Dr. Harry was not called at the competency hearing, at the start of trial fourteen months later, or at any time in between. After the competency hearing at which both Drs. Holcomb and Johnson testified, the trial court found Lyons was mentally competent to proceed.

Although the trial court did not explicitly revisit the issue of Lyons's competence at trial, fourteen months after the competency hearing, Lyons presents no evidence to demonstrate something should have alerted the trial court to reconsider its competency ruling. After the competency hearing, Lyons's counsel did not revisit the competency issue again in the trial court, on appeal to the Missouri Supreme Court, or in any post-conviction proceeding until this collateral proceeding. Acknowledging the presumption of correctness afforded the Missouri trial court, the district court properly concluded a sufficient evidentiary basis exists for the trial court's finding of competence.

## B. Ineffective Assistance of Counsel

Lyons contends his trial counsel were ineffective for failing to call state hospital doctors, who were treating Lyons before the trial, to testify Lyons did not have the mental capacity to deliberate at the time of the shootings. Lyons claims the Missouri state courts and the district court wrongly accepted his defense counsel's claims of trial strategy, without acknowledging the clear and convincing evidence their decision was driven by a lack of preparation.

The State notes trial counsel strategically rejected the State's request to have Lyons evaluated by state doctors, because defense counsel preferred a privately retained expert who would not have to turn over an unfavorable report to the State. The State also points out counsel took reasonable steps to obtain an opinion from Dr. Johnson, a private expert. By the time of trial, Dr. Johnson would not opine Lyons's diminished capacity precluded his ability to deliberate whether his conduct violated the law. The State contends the strategic decision not to use experts during the guilt phase was based on a realistic view of the evidence and also a desire not to provoke the jury.

To prevail on an ineffective assistance of counsel claim, Lyons must demonstrate counsel's performance was deficient and that he was prejudiced by that deficient performance. Strickland v. Washington, 466 U.S. 668, 687 (1984). "Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories." Foster v. Lockhart, 9 F.3d 722, 726 (8th Cir. 1993). Prejudice exists if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland. 466 U.S. at 694. "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. However, so-called "strategic choices" by counsel based on incomplete investigation are not entitled to deference. See id. at

-12-

690-91. "When a defendant challenges a conviction, we ask whether there is a reasonable probability that the defendant would not have been found guilty if counsel's performance had not been ineffective." Antwine v. Delo, 54 F.3d 1357, 1365 (8th Cir. 1995) (similarly observing that "[w]hen a death sentence is challenged, the issue is whether there is a reasonable probability that, but for counsel's deficient performance, the jury would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.").

Lyons has not met his burden of proving counsel's performance was deficient. Defense counsel's decision not to use a diminished capacity defense was reasonable, based on the evidence. Counsel strategically avoided using State-employed doctors so the defense could hire its own private doctor, because an unfavorable report from a privately retained doctor would not have to be revealed to the prosecution. Counsel wanted control of the competency issue and did not want "to subject that determination to the infamous state-appointed mental health experts." Counsel instead hired Dr. Johnson, who spent over twenty hours evaluating Lyons, talking to Lyons's family, and reviewing other information acquired earlier in the case.

Lyons's counsel also had a strategic purpose in not calling Dr. Johnson at the guilt phase of the trial. One defense attorney testified that Dr. Johnson could not give a "full-fledged" diagnosis or opinion regarding Lyons's diminished capacity. On April 16, 1996, Dr. Johnson wrote a letter to defense counsel informing them Lyons's alleged mental illness did not result in an "inability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law," and "was not of sufficient magnitude to rob him of his free will, and therefore render him non-culpable with respect to the legal issue of insanity." When Lyons's counsel met to prepare for trial, they discussed mental health issues. The lead attorney testified he "made a conscious decision or conscious call that [Lyons's attorneys] would still not inject mental health issues into the guilt phase of the trial" because the attorney did not think "a jury would accept the proposition that a major depression would mitigate

Mr. Lyons' ability to deliberate upon committing a murder." The lead attorney based this decision on his "two-pronged phobia; one my lack of expertise in this area, and the other my lack of belief in the effectiveness of mental health issues as a defense, particularly in a capital murder." Further, the lead attorney believed "the manner in which the murders occurred would support an argument of rage which would mitigate the deliberation element of a capital murder." The attorney continued, stating he "felt that doing it in that way, without having a mental health expert take the stand and try to convince a jury that [Lyons] was incapable of deliberation because he suffered from depression, . . . I think that those sorts of arguments, in the face of an infant victim and multiple victims, is offensive to juries."

Lyons argues counsel essentially gave up on a valid defense due to lack of preparation. We disagree. Trial counsel did not fail to prepare; instead, when Dr. Johnson was unwilling to provide an opinion that Lyons was incapable of deliberation, counsel formed a new strategy.

Lyons also now claims his trial counsel should have followed other leads, including using the testimony of Drs. Harry and Holcomb, to show diminished capacity. Counsel were not ineffective in their failure to call these two doctors as witnesses. The state post-conviction court found Dr. Harry's testimony unpersuasive, a finding supported by the record. Dr. Harry concluded Lyons could not deliberate or "cooly reflect" at the time of the crimes. However, Dr. Harry admitted he did not know if there is a difference "between the ability to form an intent and the ability to cooly reflect." Dr. Harry also admitted Lyons's statements to people the day before the murders showed Lyons was "thinking about" committing murder, and admitted Lyons's statements to Jackson indicated Lyons was thinking about how to get away with the murders. Finally, Dr. Harry admitted Lyons knew right from wrong and could have conformed his behavior to the requirements of the law. In contrast to Lyons's current assertion, Dr. Harry's letter, sent to counsel on the eve of trial, did not state Lyons was incompetent. The letter merely noted troubles Lyons was having

-14-

and stated Lyons might be suicidal, which has little, if any, legal effect. See Feguer v. United States, 302 F.2d 214, 236 (8th Cir. 1962) (Blackmun, J.) ("Presence of a mental illness does not equate with incompetency to stand trial."). Similarly, Dr. Holcomb's testimony revealed that Lyons's actions showed he had been thinking about the murders the day before they occurred. Dr. Holcomb agreed that Lyons's actions also demonstrated "some thought process." Also, Dr. Holcomb was the first doctor, after the initial finding of incompetence, to suggest Lyons was competent to stand trial.

Furthermore, Dr. Mark Altomari (Dr. Altomari), a clinical psychologist at the Fulton State Hospital who examined Lyons, admitted Lyons's actions showed he was "cognizant of what he [was] thinking about doing" and was "putting some thought into it." Both Drs. Altomari and Holcomb believed Lyons knew right from wrong, and Dr. Holcomb believed Lyons could have conformed his behavior to the requirements of the law.

Substantial evidence existed to undermine the likelihood of success in using a diminished capacity defense, and trial counsel did not act in an objectively unreasonable manner in deciding not to use that defense. See King v. Kemna, 266 F.3d 816, 824 (8th Cir. 2001) (concluding counsel was not ineffective for failing to raise diminished capacity defense, because psychiatrist's opinion was that the defendant did not suffer from any mental disease or defect). Adhering to the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, we conclude Lyons's trial counsel were not ineffective.

## C.    Admission of Lyons's Confession

Lyons claims the district court correctly found him incompetent at the time he confessed, correctly found the State failed to prove he knowingly waived his rights, and correctly ruled the Missouri Supreme Court's decision on the admissibility of his

confession was contrary to United States Supreme Court precedent. Lyons claims the district court erred, however, in concluding the admission of the confession was harmless beyond a reasonable doubt. The State contends the facts surrounding Lyons's confession support the finding it was made after a knowing and intelligent waiver of his right to counsel. Alternatively, the State argues any error was harmless because Lyons's competence is shown by his deliberation, which was demonstrated by his statements and actions before and after the shootings.

In Lyons's direct appeal, the Missouri Supreme Court ruled his "confession was voluntary, knowing, and intelligent." Lyons, 951 S.W.2d at 591. The court noted Lyons was advised of his Miranda rights three times before the interrogation began. Id. at 590. The court also found no direct evidence was presented to show, at the time of the interrogation and confession, Lyons did not understand his rights. Id. The court concluded the evidence showed the officers carefully and thoroughly informed Lyons of his rights, specifically that he had a right to an attorney and could stop speaking at any time. Id. at 591.

The district court assumed without deciding that Lyons's confession was not made knowingly and intelligently, concluding the "basis for the state court's decision may well be unreasonable." The district court continued, stating "the facts of this case may well warrant a conclusion" Lyons was not fully aware of the nature of the rights he was abandoning or the consequences of abandoning those rights and, therefore, the confession was inadmissible. We disagree. Lyons's competence was shown by the evidence of Lyons's advance planning of the murders and his escape, as told to his friend, Jackson; by Lyons's instructions, after the murders, to DePree, his brother, not to tell anyone where to find him, to keep the shotgun, and not to drive Lyons's vehicles because the police would be looking for them; and by Lyons's comment to the police upon his arrest that he had thrown his gun into the river. Lyons's competence also was demonstrated by his actions following his arrest. Lyons was coherent enough after his arrest to request a lawyer, and was told he would

-16-

get one. Lyons asked if anyone had died, and was told, "yes." Lyons asked if "all of them" had died, then learned they had. Again, at the police station, Lyons asked to speak to an attorney. Then, without questioning from Detective Gentry, Lyons stated he had just "just snapped" and "didn't plan on this." Lyons was later told that if he wanted to talk, he would have to initiate contact with the officers, because he had requested an attorney. After being placed in a holding cell, Lyons told officers he wanted to talk. Following three notices of his Miranda rights, Lyons made an oral statement and dictated a written statement, which he then signed.

As noted above, the Missouri Supreme Court concluded the trial court did not err in denying suppression of the statements based on Lyons's alleged inability to waive his right to counsel due to his incompetence. We hold the Missouri courts did not unreasonably, nor incorrectly, apply United States Supreme Court precedent. There is no constitutional right for "a criminal defendant to confess to his crime only when totally rational and properly motivated." Colorado v. Connelly, 479 U.S. 157, 166 (1986).

The finding that Lyons was incompetent to stand trial, regardless of when the finding was made after Lyons's arrest, does not overcome the evidence surrounding Lyons's confession, which shows he was competent, gave a voluntary, knowing, and intelligent waiver, and confessed after thrice being advised of his Miranda rights. Further, even if we were to conclude that, in our independent judgment, the Missouri Supreme Court's holding was erroneous, such a conclusion does not make that court's holding objectively unreasonable, as required under section 2254(d)(1). See Clemons, 381 F.3d at 750.

Assuming Lyons's confession was not made after a knowing and intelligent waiver of his rights, we agree with the district court that any error in admitting the confession was harmless. "[A]lthough a confession is a particularly potent piece of evidence against a defendant, its erroneous introduction may still be harmless where

-17-

the other evidence against him was so weighty it assured beyond a reasonable doubt that the jury would have returned a conviction even absent the confession." United States v. Santos, 235 F.3d 1105, 1108 (8th Cir. 2000); see also Mathenia v. Delo, 975 F.2d 444, 448 (8th Cir. 1992) (holding that while a death-penalty habeas applicant's "graphic confession was destructive to his defense, it was far from the only evidence against him," and the district court correctly found "the defense was not prejudiced since the outcome would not have been different had the confession been suppressed"); United States v. Packer, 730 F.2d 1151, 1157 (8th Cir. 1984) ("The admission of statements obtained in violation of Miranda may constitute harmless error when there remains overwhelming independent evidence as to the defendant's guilt."). Other independent evidence, including eyewitness testimony, physical evidence, and Lyons's own statements before the shootings–all of which were properly admitted–overwhelmingly demonstrated Lyons's guilt. Accordingly, even if Lyons's confession should have been suppressed, any error in admitting the confession was harmless beyond a reasonable doubt.

## III.    CONCLUSION

For the reasons stated, we affirm the district court's denial of habeas relief.

_____