# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3721

_____

Russell Bucklew,      *

       Appellant,      *

    *     Appeal from the United States

    v.      *     District Court for the

    *     Western District of Missouri.

Al Luebbers,      *

    *     [PUBLISHED]

       Appellee.      *

_____

Submitted: May 12, 2005
Filed: January 30, 2006

_____

Before LOKEN, Chief Judge, HANSEN and MELLOY, Circuit Judges.

_____

HANSEN, Circuit Judge.

Russell Bucklew was convicted in Missouri state court of capital murder and sentenced to death. He appeals the district court's[1] denial of his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. We affirm.

_____

[1]The Honorable Dean Whipple, Chief Judge, United States District Court for the Western District of Missouri.

# I.

We recite the facts of the crime as found by the Supreme Court of Missouri. See State v. Bucklew, 973 S.W.2d 83, 86-87 (Mo. 1998) (en banc) (affirming Bucklew's convictions and sentences on direct appeal), cert. denied, 525 U.S. 1082 (1999); Bucklew v. State, 38 S.W.3d 395, 397 (Mo.) (en banc) (affirming the denial of postconviction relief), cert. denied, 534 U.S. 964 (2001). Bucklew began living with his girlfriend, Stephanie Ray, and her children in the spring of 1995. In early 1996, they moved into a trailer together. In February 1996, Ray ended their relationship, and Bucklew moved into his parents' home. On March 6, 1996, Bucklew returned to the trailer that he and Ray had shared, where Ray was still living, and found Michael Sanders there. Upon concluding that Ray and Sanders were romantically involved, Bucklew put a knife to Sanders' throat and threatened to kill him. Later that evening, Bucklew found Ray and threatened her with a knife, cut her jaw, and punched her in the face. Bucklew called Ray at work the next day and vowed he would kill her, Sanders, and her children if he found them together again. Ray felt it was unsafe to return to her home, so she and her children moved into Sanders' trailer.

During the night of March 20, 1996, Bucklew stole his nephew's car and left with two pistols, two sets of handcuffs, and a roll of duct tape. The next day, he surreptitiously followed Ray as she left work, ran errands, and returned to Sanders' trailer. Bucklew waited some time in the car before knocking on the door. Sanders saw Bucklew through a window. Sanders took the children to a back bedroom and retrieved a shotgun. Bucklew entered the trailer with a pistol in each hand. When he saw Sanders emerge with a shotgun, Bucklew yelled, "Get down!" and shot Sanders twice. One bullet pierced Sanders' lung. Bucklew then fired at Sanders' six-year-old son, but missed. Ray stepped in front of Sanders, who had slumped against a wall and lay bleeding to death. Bucklew ordered Ray to drop to her knees, and when she hesitated, he struck her in the face with a pistol. He then handcuffed her, dragged her

to the car, and drove away with her. Bucklew demanded sex from her in the car, and when she did not perform every act demanded, he raped her in the back seat. The highway patrol finally stopped the car and apprehended Bucklew, but a trooper and Bucklew were both wounded in the process. Sanders died of his injuries.

The State charged Bucklew with first-degree murder, kidnapping, first-degree burglary, forcible rape, and armed criminal action, and sought the death penalty. At trial, Bucklew, represented by a team of two experienced defense attorneys, proceeded on a theory of lack of deliberation, i.e., that he was despondent over his broken relationship with Ray and his medical condition,[2] and that he acted out of a sudden passion when Sanders came out of the back room with a shotgun. The jury convicted Bucklew on all counts.

At the penalty phase of trial, the State presented evidence of Bucklew's dangerousness–specifically, his extensive criminal history including prior convictions for trespass, assault, burglary, stealing, driving while intoxicated, possession of marijuana, grand theft, assaulting past girlfriends, and escape from jail prior to trial, during which he attacked Ray's mother and her mother's fiancé with a hammer. The State also presented evidence of the impact of the murder upon the victim's family, including his young sons, as described by Sanders' mother. On cross-examination of the State's witnesses, defense counsel elicited from Ray that Bucklew had been good to her and her children in the past, and Bucklew's ex-wife said that he was a great father to their son.

---

[2]Medical records demonstrated that Bucklew suffers from the condition of cavernous hemangioma, which is inoperable and requires extensive pain medication. Bucklew's cavernous hemangioma "is a large distorted collection of blood vessels" which "occupies a better part of the right side of his face and portion of his head." (Trial Tr. at 1059-60.)

Bucklew's counsel presented the testimony of Dr. Bruce Harry, M.D., a psychiatrist, who had examined Bucklew prior to trial. Dr. Harry described Bucklew's physical impairment and his mental state, which included a diagnosis of antisocial personality disorder. Dr. Harry noted that the combined effects of Bucklew's extensive pain medication, the stressful situation of his break-up with Ray, and the resulting symptoms of depression all contributed to his lack of impulse control. He rendered the opinion that while Bucklew was aware of and responsible for his actions, he was under extreme mental or emotional disturbance at the time of the crime, which affected his actions but did not rob him of his free will or his understanding of the nature and consequences of his actions.

Dr. Harry also summarized the pretrial findings made by Michael Gelbort, Ph.D., a neuropsychologist. Dr. Harry testified extensively from Dr. Gelbort's findings, noting specifically Dr. Gelbort's finding that Bucklew's impulsiveness and inability to make judgments or solve problems in emotionally charged situations resulted from "brain deficits." (Trial Tr. at 1078.) He also noted that the objective testing administered by Dr. Gelbort placed Bucklew in the low normal range of intelligence.

Dr. Harry admitted on cross-examination that in spite of Bucklew's mental defect of depression, he had the ability to conform his conduct to the requirements of the law if he wanted to. He also stated on cross-examination that an antisocial personality disorder is a pattern of behavior that has been referred to as psychopathic or sociopathic. It includes characteristics of a pervasive pattern of violating the rights of others, and it is often accompanied by lying, manipulation, and malingering. Dr. Harry admitted that persons with this disorder often show little remorse for the consequences of their aggressive acts and blame the victims for being foolish or helpless.

To rebut the State's evidence of his dangerousness, defense counsel presented the testimony of the county jailer from the jail where Bucklew was held prior to trial but after his escape. The jailer indicated that Bucklew had been a calm and respectful prisoner who was not aggressive toward other prisoners. He said that Bucklew had not started any fights with staff and had become better adjusted to prison life. Defense counsel also presented the testimony of Bucklew's mother and father about their family life together and their love for Bucklew. In closing argument of the penalty phase, Bucklew's attorney argued that Bucklew had not assaulted other prisoners, had not been a predator in prison, and emphasized the jailer's testimony as evidence that Bucklew had adjusted well to prison life. Defense counsel assured the jury that there would be no escape from a maximum security prison.

The jury recommended a death sentence after finding two aggravating circumstances: (1) that Bucklew committed the crime of kidnapping during the murder, and (2) that he committed the crime of burglary during the murder. The trial court sentenced Bucklew to death for the murder; concurrent 30-year sentences for the kidnapping, burglary, and rape counts; and a 5-year sentence for the count of armed criminal action. The Supreme Court of Missouri affirmed the convictions and sentences. Bucklew, 973 S.W.2d at 98.

Bucklew sought postconviction relief (PCR) under Missouri Rule of Criminal Procedure 29.15, raising several claims of ineffective assistance of counsel. In particular, Bucklew asserted that his trial counsel had been ineffective in failing to call Dr. Gelbort to testify, failing to call a prison security expert to rebut the State's evidence of his dangerousness, and failing to call five character witnesses. Additionally, among other things, Bucklew argued that his counsel had opened the door to evidence of bad acts and failed to object to improper closing argument. The motion court denied relief, concluding that Bucklew's attorneys had not provided ineffective assistance. The Supreme Court of Missouri affirmed. Bucklew, 38 S.W.3d at 401.

Bucklew then filed a petition for a writ of habeas corpus in federal court pursuant to 28 U.S.C. § 2254, which the district court denied. We granted a certificate of appealability on two questions: (1) Whether Bucklew's trial counsel rendered ineffective assistance during the guilt phase of the trial by failing to investigate and present evidence relevant to his mental state at the time of the crime and by opening the door to evidence of prior bad acts; and (2) Whether Bucklew's trial counsel rendered ineffective assistance during the penalty phase by failing to investigate and present substantial mitigating evidence, failing to investigate and present evidence to rebut the State's aggravating factors, and failing to object to improper argument by the prosecutor.

## II.

When considering the district court's ruling on a petition for a writ of habeas corpus, "we review the district court's findings of fact for clear error and its conclusions of law de novo." Lyons v. Luebbers, 403 F.3d 585, 592 (8th Cir. 2005) (internal marks omitted). When a claim has been adjudicated on the merits in state court, habeas relief is warranted only if the state court proceeding resulted in (1) "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2); Rompilla v. Beard, 125 S. Ct. 2456, 2462 (2005).

The Supreme Court has explained the independent meanings of the "contrary to" and "unreasonable application" clauses. See id.; Wiggins v. Smith, 539 U.S. 510, 520 (2003); Williams v. Taylor, 529 U.S. 362, 411-13 (2000). A state court decision is "contrary to" the Supreme Court's clearly established precedent if the state court either "arrives at a conclusion opposite that reached by [the Supreme] Court on a question of law" or "decides a case differently than th[e] [Supreme] Court has on a set

of materially indistinguishable facts." Williams, 529 U.S. at 412-13. A state court decision is an "unreasonable application" of Supreme Court precedent if it "identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413; see Rompilla, 125 S. Ct. at 2462; Liggins v. Burger, 422 F.3d 642, 646-47 (8th Cir. 2005). "A federal court may not issue the writ simply because it 'concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" Lyons, 403 F.3d at 592 (quoting Williams, 529 U.S. at 411).

This appeal involves claims of ineffective assistance of counsel. To prevail on an ineffective assistance claim, Supreme Court precedent requires a petitioner to demonstrate that counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance to such an extent that there is a reasonable probability that the outcome of the trial would have been different absent counsel's error. See Strickland v. Washington, 466 U.S. 668, 687, 694 (1984). Judicial scrutiny of counsel's performance is highly deferential, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional judgment. Id. at 689. Prejudice is shown by demonstrating that counsel's errors were so serious that they rendered the proceedings fundamentally unfair or the result unreliable. Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). Under Strickland, counsel's performance is "measured against an objective standard of reasonableness," and "hindsight is discounted by pegging adequacy to counsel's perspective at the time investigative decisions are made, and by giving a heavy measure of deference to counsel's judgments." Rompilla, 125 S. Ct. at 2462 (internal quotations and citations omitted). Because the Supreme Court of Missouri correctly identified Strickland as the controlling authority for ineffective assistance of counsel claims, we address

whether the state court unreasonably applied that precedent and whether the state court unreasonably determined the facts in light of the evidence presented.[3]

## A. Ineffective Assistance Claims in the Guilt Phase
### 1. Mental State–Dr. Gelbort

Bucklew first argues that his trial attorneys rendered ineffective assistance of counsel during the guilt phase of the trial by failing to call Dr. Gelbort to testify concerning Bucklew's state of mind at the time of the crime and how his brain dysfunction affected his ability to deliberate. Bucklew's defense at trial was that he did not deliberate prior to killing Sanders but acted out of a sudden passion. At the PCR motion hearing, Dr. Gelbort testified that his evaluation and testing of Bucklew prior to trial had revealed the presence of "organic brain dysfunction," which he stated could also be described as "an organic personality disorder." (PCR Tr. at 68.) Dr. Gelbort testified that "Mr. Bucklew shows up with a pattern of results on testing that demonstrate that when pushed to extremes when he's dealing with complex information, emotionally laden or charged information, when he has to process information quickly, then his thinking skills deteriorate rapidly and he shows very

---

[3]We find unpersuasive Bucklew's argument that the district court did not apply the controlling authorities of Wiggins and Williams. Like the state court, the district court correctly identified Strickland as the controlling Supreme Court precedent. In ruling on Bucklew's Federal Rule of Civil Procedure 59(e) motion to alter or amend its judgment, the district court squarely addressed the Wiggins and Williams cases. The district court concluded that these cases do not amount to supervening precedent but demonstrate specific applications of Strickland to particular fact situations which are distinguishable from this case. The district court did not err in concluding that the present case does not involve similar facts of a failure to investigate or discover important mitigating evidence as in Wiggins, 539 U.S. at 527-29 (finding counsel failed to uncover the existence of extensive sexual and psychological abuse as a child), and Williams, 529 U.S. at 395-98 (finding counsel failed to conduct an investigation that would have revealed a nightmarish childhood filled with abuse and a condition of borderline mental retardation). Thus, the district court applied the correct legal authorities.

-8-

clearly his impairments." (Id. at 71.) More specifically, Dr. Gelbort testified that in the emotionally charged situation that unfolded in Sanders' trailer before the murder, he could "not see where [Bucklew] would have been able to coolly deliberate at that point in time." (Id. at 80.)

The PCR motion court concluded that Dr. Gelbort's testimony was not persuasive on the issue of Bucklew's lack of ability to deliberate because of the "truly overwhelming" evidence of deliberation in this case–that is, Bucklew's prior threat to kill Sanders; arming himself with two guns, two knives, extra ammunition, and two sets of handcuffs; traveling to lie in wait for Ray; and following her to the victim's home, where he then killed Sanders and kidnapped and raped Ray. (Legal File at 96; Bucklew v. Missouri, No. 98CC79828, at 5 (Circuit Court of Boone County, Mo., Dec. 29, 1999).) The PCR motion court found that "[a]n opinion by a psychologist flying in the face of such evidence pales by comparison." (Id.) Because Dr. Gelbort's testimony would not have made a difference to the jury, the PCR motion court found no prejudice under Strickland.

On appeal, the Supreme Court of Missouri affirmed, finding that, while Dr. Gelbort would have testified that Bucklew was not able to form the intent to deliberate, he "would also have confirmed that Bucklew has characteristics associated with antisocial personality disorder." Bucklew, 38 S.W.3d at 398. Additionally, Bucklew's "[t]rial counsel was concerned about introducing this point during the guilt phase." Id.

Bucklew asserts that the state supreme court unreasonably determined the facts in light of the record because his trial counsel did not articulate a strategic reason for not calling Dr. Gelbort at the guilt phase and never even asked Dr. Gelbort to render an opinion as to whether Bucklew was able to deliberate at the time of the shooting. Bucklew's attorney testified that he could not recall whether he had asked Dr. Gelbort to render a theory about Bucklew's ability to deliberate, and that, while he had

engaged in "a thought process" about whether Dr. Gelbort should testify, he could not recall his exact thought process. (PCR Tr. at 173-75.) The record, however, includes testimony from Dr. Gelbort that counsel had indicated to him a concern that he should not testify at trial because not all of his findings were beneficial to the defense. Dr. Gelbort admitted at the PCR hearing that his discussion of Bucklew's behavior as consistent with and characteristic of an antisocial personality disorder would not have been helpful to the defense. The record also shows that counsel had considered both doctor's reports prior to trial, and that, despite Dr. Gelbort's assertion that Bucklew has brain deficiencies and functions in certain circumstances at a level of one who has suffered brain injuries, Dr. Harry had concluded that Bucklew was capable of knowing and appreciating the nature, quality, and wrongfulness of his conduct at the time of the crimes. Our review of the record leads us to conclude that the state court did not unreasonably determine the facts in light of the record.

Even assuming counsel performed deficiently by not calling Dr. Gelbort to testify at the guilt phase of the trial, we agree with the district court that the state court did not unreasonably apply Strickland. The state supreme court determined that there was no prejudice because Dr. Gelbort's testimony would not have produced a different outcome at trial. While Dr. Gelbort could have testified to his opinion that Bucklew was not capable of cool deliberation at the moment he pulled the trigger, Dr. Gelbort's testimony necessarily would have included a great deal of negative information about Bucklew's mental state. More importantly, a deteriorating or impaired thought process immediately preceding the shooting, as Dr. Gelbort would have testified to, could not negate the extensive, indeed overwhelming, objective evidence of pre-crime planning and deliberate planned conduct in which Bucklew engaged. See Lyons, 403 F.3d at 596 ("Substantial evidence existed to undermine the likelihood of success in using a diminished capacity defense, and trial counsel did not act in an objectively unreasonable manner in deciding not to use that defense.")

## 2. Opening the Door to Prior Bad Acts Evidence

Bucklew asserts that his counsel was ineffective for opening the door to evidence of prior bad acts, namely his assault against Ray on March 6, 1996. The trial court initially had granted a motion in limine to prevent the prosecutor from referencing this assault. Bucklew's counsel then referenced the incident in opening statements to demonstrate that Bucklew was distraught after discovering that Ray was romantically involved with Sanders. This reference opened the door for the prosecutor to admit all of the attendant circumstances, including that Bucklew had threatened and assaulted Ray that day.

The Supreme Court of Missouri concluded that counsel's performance was not deficient because, regardless of the trial court's ruling in limine, the evidence was admissible under state law as evidence of motive, absence of mistake or accident, and common scheme or plan. Bucklew, 38 F.3d at 401. In the habeas context, "[r]ules of evidence and trial procedure are usually matters of state law. A federal issue is raised only where trial errors infringe on a specific constitutional protection or are so prejudicial as to amount to a denial of due process." Adail v. Wyrick, 711 F.2d 99, 102 (8th Cir. 1983). Bucklew does not argue that the evidence was in fact inadmissible on a specific constitutional ground, and when viewed in light of all the evidence of this crime, the evidence of the March 6 assault was not so prejudicial as to amount to a denial of due process. The state court determination– that counsel's act of opening the door to evidence otherwise admissible on state law grounds is not ineffective assistance under Strickland–is not an unreasonable application of federal law.

## B. Ineffective Assistance Claims in the Penalty Phase
### 1. Mitigating Evidence–Dr. Gelbort

Bucklew argues that his trial attorneys rendered ineffective assistance during the penalty phase by failing to call Dr. Gelbort to testify concerning his diagnosis of organic brain dysfunction and its effect on his behavior. The state courts concluded

that Dr. Gelbort's testimony would have been cumulative in the penalty phase and that Bucklew did not prove a reasonable probability that this testimony would have produced a sentence other than death. The Supreme Court of Missouri noted that "Dr. Gelbort's findings were summarized–almost verbatim–by Dr. Bruce Harry, M.D.," who testified during the penalty phase concerning Bucklew's mental condition as well as his physical condition and the effects of his medication. Bucklew, 38 S.W.3d at 398.

Bucklew argues that his attorneys were deficient because his lead counsel at the penalty phase never spoke with Dr. Gelbort. It is not deficient performance for a team of attorneys to divide among them the workload of a case in a rational and efficient manner. We emphasize that this case does not involve an incomplete investigation by Bucklew's team of two attorneys. Cf. Wiggins, 539 U.S. at 524 (holding counsel improperly abandoned their investigation into the defendant's background after acquiring "only rudimentary knowledge of his history from a narrow set of sources"). Prior to trial, his attorneys thoroughly investigated his background by talking with Bucklew and his family and consulting medical and legal records. They also thoroughly investigated his state of mind at the time of the offense, obtaining the opinions of both Dr. Gelbort, a neuropsychologist, and Dr. Harry, a psychiatrist. Although one of Bucklew's attorneys did not speak with Dr. Gelbort, the other member of the defense team spoke with him and forwarded his evaluation to Dr. Harry, whom the defense team eventually decided to call as a witness at the penalty phase. Counsel indicated at the PCR hearing that they chose Dr. Harry to testify because, as both a medical doctor and a psychiatrist, he could give the most complete picture of Bucklew's mental and physical condition. It was reasonable to choose an expert whom the attorneys determined could give the most comprehensive picture of Bucklew's condition and to avoid calling a second expert who would have the potential of overemphasizing the undesirable behavioral characteristics of Bucklew's personality that Dr. Gelbort would have been asked to confirm on cross-examination.

Bucklew asserts that Dr. Gelbort's testimony would not have been cumulative because he could have given a more complete picture of Bucklew's condition, but the state court's contrary decision is supported by the record. Dr. Harry's testimony summarized Dr. Gelbort's evaluation, in part, as follows:

> He [Dr. Gelbort] talked about Mr. Bucklew being alert, oriented to person, place, time and situation. Had a normal range of mood and was mildly sad under the circumstances. He had some problems with mental control. He specifically mentioned that while [Mr. Bucklew] was able to do more straight-forward tasks, his mental control, that is the ability to control his mental activity broke down as the complexity of the tasks increased. In addition, he noted that his information processing speed, that is the ability in the speed with which he can take in new information coming at him from a variety of sources and put it together and make some sense out of it also declined significantly with more complex tasks. He showed . . . a tendency to act before thinking, act suddenly and without thought or warning. And trouble managing multiple cognitive tasks at one time. . . . Also, he had an IQ Test . . . that is in the low normal range. . . . To the extent we know, it's brain deficits, it's not lack of desire or not wanting to. It's a person can't do it. . . . And [Dr. Gelbort] noted that when confronted with rapidly evolving complex types of activities, cognitive activity he's expected to respond at essentially chance levels.

(Trial Tr. at 1076-79.)

Dr. Harry's testimony substantively encompassed the totality of Dr. Gelbort's findings–mainly, that Bucklew's neurological brain deficits affected his behavior, severely impairing his reasoning and problem-solving abilities in rapidly evolving situations. The fact that Dr. Harry used the term "brain deficits" rather than "brain dysfunction" does not render counsel's performance deficient. We cannot conclude that counsel's performance was outside "the wide range of reasonable professional assistance" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 689; see also id. at 690 (noting that "strategic choices made after thorough investigation of law and

facts relevant to plausible options are virtually unchallengeable"). Nor can we say that the state court unreasonably determined that Dr. Gelbort's testimony would have been cumulative at the penalty phase.

### 2. Mitigating Evidence–Additional Character Evidence

Bucklew asserts that his trial attorneys were ineffective in not calling five friends and family members to testify as character witnesses on his behalf. Bucklew's brother and sister-in law and a friend, Mike Walton, would have testified about Bucklew's prior good treatment of Ray and her children, his deteriorating health, and their opinion that he was not violent. John Rhode would have testified that Bucklew was a good friend and kind person, and another friend, Kimberly Nichols, also would have testified that Bucklew had been kind to her. The Supreme Court of Missouri concluded that Bucklew was not prejudiced by counsel's failure to call these witnesses because their testimony would have been cumulative and would have had little beneficial impact after the witnesses had been confronted in cross-examination with Bucklew's numerous undisputed violent and dishonest prior acts. See Bucklew, 38 S.W.3d at 400-01.

Trial counsel did not fail to investigate or present mitigating character evidence; they elicited testimony from Bucklew's ex-wife that he was a good father, and his parents testified of their love for him. Ray herself testified that Bucklew had been good to her and her children in the past. Dr. Harry testified about Bucklew's deteriorating health. The prosecutor undisputably had a wealth of information available for cross-examination to demonstrate Bucklew's violent and deceptive past in contradiction to the testimony of the five character witness Bucklew now identifies. Thus, the state court's conclusion that these witnesses would have provided cumulative evidence that may even have been harmful and would not have affected the outcome was not an unreasonable application of federal law.

### 3.  Rebutting Future Dangerousness

Bucklew argues that his attorneys were ineffective in failing to investigate and present expert testimony to rebut the State's evidence of future dangerousness and to testify about prison security issues.  At the PCR hearing, Bucklew presented the testimony of a private prison security expert, James Aiken, who could have testified at the penalty phase that Bucklew would not pose a serious risk of escape from prison and that he could be safely and effectively housed in a maximum security setting. Bucklew's attorneys testified that they did not consider consulting such an expert but believed that a jury would have a common sense understanding of the difference in security levels between a county jail setting from which Bucklew escaped prior to trial and a maximum security prison.  They also articulated concern about information that would be admitted during the cross-examination of such an expert.  The Supreme Court of Missouri concluded that Bucklew did not clearly show that the failure to call a prison security expert was not a reasonable trial strategy, and that in any event, such testimony would have been cumulative.  See Bucklew, 38 S.W.2d at 398.

The failure to investigate or retain a private security expert in this case is supported by reasonable professional judgment.  See Strickland, 466 U.S. at 690-91 (stating that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").  By presenting the testimony of the county jailer, Bucklew's counsel was able to limit the testimony to Bucklew's conduct while in that jailer's presence and thereby avoid an examination of his complete record of incarceration.  Bucklew's counsel expressed concern that a prison security expert would have been susceptible to cross-examination concerning the frequency of assaults and killings in prison in general, as well as the prior disciplinary infractions and negative comments in Bucklew's record of past incarcerations.  Additionally, the State did not present a prison security expert at the penalty phase, and thus this case is unlike Williams, where trial counsel failed to discover that the state's own experts

would have testified that Williams would not pose a future danger to society if kept in a structured environment.  529 U.S. at 370-71.

Even if counsel's performance was deficient for not investigating such an expert, no prejudice resulted.  There is no reasonable probability that the outcome would have been different had such an expert testified because any possible benefit from such expert testimony would pale in comparison to Bucklew's actual behavior both prior to and after his arrest.  The mixed impact it could have had in this particular case as articulated by Bucklew's counsel supports the conclusion that counsel was not ineffective.  The state court reasonably applied federal law in denying this claim.

### 4.  Closing Argument

Bucklew asserts that his attorneys were ineffective in failing to object to the prosecutor's victim impact argument at the penalty phase.  To establish ineffective assistance for failing to object to a prosecutor's closing argument, Bucklew must demonstrate, as in every ineffective assistance claim, not only that counsel's performance was deficient, but also that there is a reasonable probability that, but for counsel's failure to object, the result of the proceeding would have been different.  See Hall v. Luebbers, 341 F.3d 706, 719 (8th Cir. 2003) (citing Strickland, 466 U.S. at 687-88), cert. denied, 541 U.S. 996 (2004).

The prosecutor argued that when the Sanders children are adults, they will look back at this jury's decision "in the case where the cold-blooded sociopath gunned down [their] daddy" and will ask whether justice was achieved.  (Trial Tr. at 1170.)  The prosecutor also argued that the Sanders children will someday question whether the ultimate punishment was given for the ultimate crime, and stated, "I am asking you to make the punishment fit the crime and to give him the death penalty."  (Id.)  The prosecutor intimated that the Sanders children would want the death penalty imposed, but the children did not actually testify during the penalty phase.  Sanders' mother testified but did not offer an opinion concerning the appropriate sentence.  See Payne

-16-

v. Tennessee, 501 U.S. 808, 827 & 830 n.2 (1991) (holding a state may permit evidence of the impact of a crime on the victims and their families when the jury is considering whether to impose the death penalty, and noting that this holding leaves undisturbed the Court's prior holding that family members of victims may not give their opinions concerning what sentence would be appropriate).

The Supreme Court of Missouri found that the prosecutor's victim impact argument in this case was only an indirect reference to the victims' wishes and that Bucklew had not shown a reasonable probability of a different outcome at trial. Bucklew, 38 S.W.3d at 399. The federal district court concluded that the state court's finding was an unreasonable determination of the facts on the record because the state trial court would have sustained an objection to the prosecutor's inference that any verdict other than death would be a failure in the eyes of the Sanders children. Nevertheless, the district court agreed with the state supreme court's conclusion that Bucklew suffered no prejudice from the prosecutor's allusion to the wishes of the Sanders children. We agree with the district court's and the state court's ultimate conclusion that the prosecutor's isolated references to what the Sanders children would think, when taken in context and compared to the whole record of evidence in this case, would not have affected the outcome of the penalty phase.

Bucklew also asserts that his attorneys were ineffective for not objecting to the prosecutor's remarks allegedly injecting his personal opinion into the argument. Bucklew complains of a statement by the prosecutor to the effect that no one deserves the death penalty more than Bucklew. (See Trial Tr. at 1138 ("Ladies and gentlemen, if this crime does not deserve the death penalty, then what would? Who deserves the death penalty if not this sociopathic killer?").) The Supreme Court of Missouri found that this argument did not assert any personal knowledge of facts in issue but was instead rhetorical. Bucklew, 38 S.W.3d at 400. The district court was careful to point out that an impermissible argument is not rendered permissible merely by phrasing it

in a rhetorical fashion, nevertheless, the court concluded that the state court decision was not unreasonable.

The Supreme Court instructs that "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction [or sentence] a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal marks omitted). We consider the weight of the evidence and whether the improper argument misstated evidence or implicated other specific rights of the defendant. See id. at 182. While it is improper to mislead a jury with comments indicating a personal belief that this defendant deserved the death penalty more than any other, see Newlon v. Armontrout, 885 F.2d 1328, 1336 (8th Cir. 1989), cert. denied, 497 U.S. 1038 (1990), we agree with both the state supreme court and the district court's determinations that the comments in this case did not imply personal knowledge of facts outside the record and did not render the result of the proceedings unfair.

III.

Accordingly, we affirm the judgment of the district court.

_____